IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO.   15-398 |
| WAYDE MCKELVY | : | |

GOVERNMENT'S TRIAL MEMORANDUM

The United States of America, by its attorneys WILLIAM M. McSWAIN, United States

Attorney for the Eastern District of Pennsylvania, and ROBERT J. LIVERMORE and SARAH

M. WOLFE, Assistant United States Attorneys, respectfully represent as follows:

I.     **INTRODUCTION**

Defendant WAYDE MCKELVY is scheduled to begin trial before the Honorable Joel H.

Slomsky on September 24, 2018.   MCKELVY is charged in Counts One through Ten of the

Indictment with: (1) conspiracy to commit wire fraud, in violation of 18 U.S.C. § 371; (2-8)

seven counts of wire fraud in violation of 18 U.S.C. § 1343; (9) conspiracy to engage in

securities fraud, in violation of 18 U.S.C. § 371; and (10) securities fraud in violation of 15

U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10b-5.

III.    **GOVERNMENT'S EVIDENCE**

A.     **Overview**

TROY WRAGG, AMANDA KNORR, and WAYDE MCKELVY ran an elaborate Ponzi

scheme collectively known as Mantria Corporation which received more than $54 million in

fraudulently obtained new investor funds.   WRAGG, KNORR, and MCKELVY promised

investors huge returns, as high as 484%, for securities investments in supposedly profitable

business ventures in real estate and green energy.   In reality, Mantria was a classic Ponzi scheme in which new investor money was used to pay "returns" to early investors and their businesses generated meager revenues and no actual profits.   To induce investors to invest money in their businesses, WRAGG, KNORR, and MCKELVY repeatedly made fraudulent representations and material omissions about the economic state of their businesses.   WRAGG, KNORR, and MCKELVY sold what they planned to do in the future as the current reality. When the SEC shut down Mantria in November 2009, their pyramid scheme collapsed and their Ponzi scheme was exposed.

WRAGG was the CEO of Mantria.   WRAGG controlled all aspects of Mantria.   All important Mantria decisions were made by WRAGG in consultation with WAYDE MCKELVY, whom WRAGG considered to be his mentor.

In 2005, AMANDA KNORR was WRAGG's girlfriend.   KNORR graduated from Temple in 2006 with a degree in biological anthropology and later began to work full time at Mantria.   On paper, KNORR was the President and Chief Operating Officer.   In reality, KNORR was more of an office manager tasked with implementing WRAGG's ideas.   In addition, Mantria promoted KNORR as the "science" expert given her degree in a science field. KNORR occasionally gave presentations to current or prospective Mantria investors on the science behind Mantria's green energy technologies.   The purpose of the presentations was to re-assure investors that the science behind Mantria's business proposals was sound when, in truth, the science was quite speculative.

WRAGG and KNORR were able to raise such fantastic sums of money through the assistance of MCKELVY, an unlicensed securities salesman from Colorado.   Although he had

little financial acumen, MCKELVY promoted himself as a financial wizard through aggressive marketing tactics.   MCKELVY ran a company called "Speed of Wealth" which promised to teach investors how to become "stinkin, filthy rich."   MCKELVY then formed an investment club of sorts to invest in real estate and other projects.   When WRAGG met MCKELVY, Mantria was broke and unable to raise funds from any other source.   At the same time, MCKELVY was having his own investment problems.   The investments which he had touted were all losing money and his investors were growing restless.

Therefore, WRAGG came up with a proposal to save both MCKELVY and himself. MCKELVY liquidated his losing investments and invested that money into Mantria.   WRAGG gave MCKELVY's investors full credit on paper for their investments in Mantria and covered their previous losses.   Thus, Mantria provided MCKELVY a way to exit these other investments, save face, and generate huge paper returns for his investors.

MCKELVY thus became WRAGG's and Mantria's lifeline of support.   MCKELVY continued to hold seminars for prospective investors and touted the fantastic paper returns which were purportedly being generated by Mantria.   During these seminars, MCKELVY lied to prospective investors about the financial state of Mantria and omitted material facts in order to dupe them into investing.   MCKELVY also lied about his knowledge of and participation in Mantria's business operations.   In return for raising huge sums of money, WRAGG and KNORR paid MCKELVY a commission between 12% and 15% of all new investor funds which he generated – another material fact which they failed to disclose to investors.   Of the $54 million raised, MCKELVY personally pocketed more than $6 million in proceeds from the victims.

Defendants WRAGG, KNORR, and MCKELVY frequently used wire transfers to move funds and facilitate their Ponzi scheme.   Virtually all of the new investor money was sent via wire transfer to Mantria's bank accounts.   Mantria, based in Bala Cynwyd, Pennsylvania, sent MCKELVY his "commissions" via wire transfer to an entity he controlled called "Retirement TRACS, LLC".   Mantria also used wire transfers to pay for other portions of the Ponzi scheme, including payments for both the real estate and green energy projects.

###    B.    Early Years of Mantria

TROY WRAGG and AMANDA KNORR dated while attending Temple University. WRAGG graduated in December 2005 and founded Mantria around that time.   KNORR joined Mantria after graduating in May 2006.   In college, WRAGG wrote a report on an emerging real estate market in Tennessee.   In 2005, WRAGG visited his sister in Tennessee and talked to her father-in-law, Dr. George R. Dixson, an experienced real estate investor, about selling real estate. Dr. Dixson introduced WRAGG to a friend who also owned a lot of land.   WRAGG performed a real estate transaction for the friend and received a $70,000 commission for performing this transaction.   WRAGG used those funds as seed capital for Mantria.

Emboldened by his early success in this real estate venture, WRAGG negotiated a deal with Dr. Dixson to sell some of his land in Tennessee.   Dr. Dixson owned a lot of land in Van Buren County, Tennessee along the Cumberland plateau.   The land was very rural, undeveloped and worth approximately $500 to $2000 per acre.   Most of the land was heavily wooded and had been used for timber harvesting and some strip mining activity.   The land had a shortage of potable water.    Much of the water in the county was contaminated by the past strip mining activity in the area.   The contamination gave the water an orange color.   Water for any real

estate development would have to be pumped from a neighboring county over a mountain.   A

pipeline and pumping stations would have to be built to accomplish this feat at considerable

expense.   In addition, part of the land had been used during the Second World War as a test

firing range and possibly contained unexploded shells.[1]

Dr. Dixson deeded the land to WRAGG and Mantria to sell on a seller-financed note.

WRAGG did not pay Dr. Dixson any money up front.   Under the terms of the deal, Dr. Dixson

received about $4000 per acre when WRAGG sold each acre of land.   Importantly, if WRAGG

did not sell the land within a certain time period, Dr. Dixson could take the land back.   By

receiving the deed, Mantria also assumed responsibility for paying all the real estate taxes on this

land.

WRAGG began to imagine grand plans for this venture with several different planned

communities.   WRAGG hired his aunt and his sister to do sales and marketing for this real

estate venture.   His aunt found a real estate agent in Florida who had some investors interested

in buying land in Tennessee.   WRAGG rode the tidal wave at the end of the real estate market's

frenzied boom years and sold a small portion of the undeveloped land to speculators for $10,000

to $30,000 an acre, promising that the land could be worth $80,000 an acre once developed.

WRAGG paid an appraiser to state that the land would be worth that $80,000 an acre once the

real estate development was completely built with homes, infrastructure, and willing buyers.

WRAGG negotiated similar deals with other landholders in the area and started selling their land

to speculators.   Short on cash, Mantria performed a few cosmetic improvements to the land but

---

1       In 2001, a boy in neighboring White county lost his hand when he played with an old
artillery shell resulting in an $8 million lawsuit.

no real development.   While a few gravel roads were built and electric lines were strung, none of the home sites had a source of water or a means to dispose of sewage.   The purpose of these "improvements" was to give the appearance of a development project to prospective investors. The land remained the uninhabitable wasteland that it had been for decades and the development of the land fell far short of justifying the $80,000 figure.

Mantria's earliest security offerings dealt with this real estate development in Tennessee. Mantria claimed that they "owned" 6,533 acres of land in Tennessee through a partnership Mantria Communities, LP.   Mantria Communities, LP, claimed to be developing this land into several master planned communities, including Indian Trails Estates and Ironbridge Village in Van Buren, County, Mantria Place and Legacy Ridge in Sequatchie County, and Iris Village in Grundy County.   There were other concept communities, such as Mantria Village and Mantria Bluffs, which were planned and discussed but never sold.   Importantly, the securities offerings did not mention that Mantria's interest in the land was contingent according to the terms of the purchase agreements with Dr. Dixson and the other landowners.

For example, Indian Trails Estates purported to be a master planned community with 302 potential home sites, each home site sitting on one acre of land which Mantria touted to be worth $88,000.  Of course, a "potential" home site merely means that someone, at some point in time, could potentially build a house there.   A small amount of cosmetic development was done at Indian Trail Estates but not completed and no homes were actually built.   Mantria obtained the land through a seller-financed contract.   Mantria obtained title to the land but did not have to pay the seller until the land was resold.   Most of this land was resold to investors financed with Mantria funds through Mantria Financial with little to no money down.

Mantria Place purported to contain 3,000 home sites on 5,429 acres of land.   Mantria obtained this land on a seller financing agreement from the McClelland Foundation.   About 150 lots were sold.   After the SEC shutdown Mantria, the McClelland Foundation simply foreclosed and took back the remainder of the land – demonstrating how tenuous Mantria's title to the land really was.   The Dunlap carbon diversion plant, discussed in more detail below, was located on this property as well.

Mantria was required by securities law to include all of the contingencies and problems with the real estate backing their securities offerings.   For example, in a private placement memorandum (PPM) to raise $5 million in common stock for Mantria dated May 15, 2009, the PPM claimed that Mantria "owned" approximately 6,000 acres in Tennessee in five communities "developed by Mantria, with a total appraised value of $70,000,000."   The PPM stated that Mantria had sold 235 acres of "buildable" lots.   The PPM stated that the investment would be returned after three years.   The PPM estimated profits at 34.50% over the three year period. The PPM further stated that "The Common Stock Buyback Program gives you a 100% ROI by us repurchasing the common Stock at the end of 2011."   After the return of the investment after three years, the PPM promised a "total estimated return on investment" as 134.50%.   The PPM further promised that the investment would be guaranteed with real estate with a "2 to 1 Ratio on your original investment, which means if you invest $50,000 you will receive $100,000 worth of collateral."   The PPM did not reveal all of the contingencies and problems with the real estate nor did it provide an honest assessment of Mantria's financial condition and prospects.   If Mantria had told investors the truth about the land, no one would have invested in their securities

offerings.   In order to dupe speculators into investing in this real estate through the security, the PPM contained numerous false statements and material omissions.

Contrary to their representations to investors that they were earning extravagant returns on selling real estate, Mantria's real estate development was plagued by financial problems from the start.   Mantria needed a substantial amount of funds to develop the land, funds which they did not have.   WRAGG planned to sell the land to raise the funds, but needed to show some development in order to market and sell the land.   By the end of 2006, Mantria was on the verge of bankruptcy and had defaulted on its debts to Dr. Dixson and the other landowners.   To keep Mantria from going bankrupt, Dr. Dixson loaned WRAGG $50,000 in December 2006.   In an email dated December 28, 2006, Dr. Dixson suggested that WRAGG file for bankruptcy if he could not pay him back.   On January 1, 2007, WRAGG emailed Dr. Dixson and explained to him that he was in the process of re-organizing Mantria's debt so that he could pay Dr. Dixson back.   WRAGG thereafter negotiated several large loans with third-parties to keep Mantria funded in the short term.   Nonetheless, Mantria's financial problems continued throughout 2007 because they could not sell very much land.   Far from being the astronomical commercial success WRAGG described to investors, Mantria barely managed to survive and stave off bankruptcy.

### C.       Mantria Financial

The creation of Mantria Financial was a watershed moment for Mantria.   Initially, a small amount of the land in Tennessee was sold either to cash buyers or through mortgages offered by major U.S. banks which, at that time, offered "no document" loans.   Mantria received a total of about $300,000 in revenue from the sale of the land.   When the financial crisis hit in

2008, real estate prices crashed, the availability of loans disappeared, and sales plummeted nationwide.   Undaunted, WRAGG used his entrepreneurial spirit and decided that Mantria would create a "bank" and start offering mortgages in addition to selling the land.   WRAGG hired an attorney, Christopher Flannery, to help him secure the necessary licenses.   In early 2008, WRAGG received approval from the State of Tennessee to form a financial institution, called Mantria Financial, and to start financing mortgages on the land.

Mantria now needed new investor funds to "finance" the loans for the sale of real estate in Tennessee.   With the real estate market plunging, willing investors were hard to find. WRAGG, therefore, sold the land under contracts which allowed real estate buyers to walk away from the transaction if the land did not increase in value in order to induce investors to sign the real estate contracts.   The real estate buyers were not required to put any money down or pay any closing costs.   In addition, the buyers did not have to pay interest, principal, or real estate taxes for a set time period.   In fact, many of the real estate investors even received a cash bonus of $3000 or 5% cash back from Mantria after closing as an added inducement to buy the land. Nonetheless, despite these unusual terms, each sale was run through a title company, a mortgage was written, and a HUD-1 form was produced just like any other real estate sale.

The economic reality of real estate sales was far different from the extraordinary success claimed by WRAGG.   Mantria was in fact losing a substantial amount of money on every real estate sale.   Not only did Mantria have to pay $3000 or 5% cash back to many of the buyers, they also paid substantial sums in closing costs to the title company on each transaction.   In addition, Mantria paid commissions to its employees for the sale of land.   Mantria also had to pay the landowners to purchase the real estate under the seller financing contracts.   As a result,

9

while WRAGG, KNORR, and MCKELVY told prospective securities investors that Mantria was wildly successful in the real estate market, the sales were only illusionary and the profits nonexistent.   In reality, Mantria simply created a real estate bubble exclusively inflated by the investor funds into Mantria Financial.   The bubble was not supported by any real economic development.   Once this bubble inevitably burst, the Mantria securities investors would lose their money.   In this manner, the securities investors in Mantria and Mantria Financial became the victims of WRAGG, KNORR, and MCKELVY's Ponzi scheme.

### D.    WAYDE MCKELVY

While WRAGG created the mechanism to inflate the real estate bubble in Tennessee, he still needed new investor funds to act as the air to inflate that bubble.   Initially, investors willing to support Mantria were scarce.   Mantria continued to struggle to pay its bills.   Each month, WRAGG and KNORR sat down with their accountant and decided which bills could be paid and which bills had to wait.   Short on cash, Mantria essentially existed month to month.   WRAGG needed a master showman and marketer who could sell his ideas to the public and solve his cash flow problem.

In the fall of 2007, a Mantria salesman introduced WRAGG to WAYDE MCKELVY. MCKELVY operated what he called "Speed of Wealth" investment clubs in Colorado which promised to make investors "stinkin, filthy rich".   An insurance salesman by trade, some of the initial members of his club included his insurance clients.   To skirt SEC registration rules, MCKELVY claimed that the clubs were merely educational and that he was not promoting or selling securities, which the transcripts of the presentations clearly show that he was doing.   As an insurance salesman, MCKELVY taught investors to withdraw funds from their brokerage or

retirement accounts, overfund insurance policies, and then take the maximum possible loans from these policies.   MCKELVY also coached his investors to withdraw the maximum amount of money from financial institutions in the form of credit card loans, home equity loans, and other types of bank loans.   MCKELVY instructed investors to take the proceeds from all of those sources and invest in "high return" investments such as Mantria.   MCKELVY's theory was that investors could profit from the spread between the loans and their other investments. MCKELVY called the spread "arbitrage" and claimed that this is how the "super-wealthy" invested and made millions of dollars.

Most of MCKELVY's early investment proposals to the Speed of Wealth Club members centered on profiting from the tail end of the real estate boom.   By early 2008, these investments were losing money.   When MCKELVY learned about the huge paper returns that WRAGG and Mantria were making on their Tennessee land investments, MCKELVY jumped at the chance to pitch this investment to his club.   On paper, Mantria was making huge profits buying land for $4,000 and selling it for $20,000 or more.   WRAGG and MCKELVY claimed that in 2008, Mantria had $11 million in revenue from the land sales and $2 to $3 million in profit.   In reality, almost all of this new "revenue" was simply new investor funds artificially pumping up the value of this almost worthless land in Tennessee.   WRAGG and MCKELVY also did not account for the massive cash loss Mantria took on each real estate transaction and the fact that the real estate "buyers" could walk away in two years without paying any money.

In July 2008, Mantria Financial sought to raise $70 million through a Private Placement Memorandum (PPM).   WRAGG, KNORR, and MCKELVY circulated this PPM to prospective investors.   According to SEC regulations, all of the Mantria investors were required to be

"accredited investors," meaning that they had sufficient income, net worth, and investing experience to understand that an investment in Mantria was extremely risky and that they could afford to lose their entire investment.   Unfortunately, MCKELVY and WRAGG ignored the SEC regulations and very few of the Mantria investors were in fact accredited.   Rather, MCKELVY advertised on radio, television, and the internet and offered Mantria investments to the general public.   On the urgings of MCKELVY and WRAGG, many investors withdrew their life's savings from their retirement accounts or even took out loans to invest in Mantria.   The Mantria Financial PPM promised that about $65 million of that money would be used to make loans to borrowers to buy the land in Tennessee.   The PPM promised an estimated annual return of 9% to 12%.   The PPM stated that they would put the investment money to work "immediately" and that they had "buyers in place" to use the $65 million by December 31, 2009. Using false representations and material omissions in selling this security, WRAGG, KNORR, and MCKELVY raised millions of dollars which they used to pay "earnings" to other investors.

Mantria's lawyer, Christopher Flannery, repeatedly counseled WRAGG and KNORR that their false and overly optimistic representations to investors were improper under federal securities law.   For example, in an e-mail dated April 7, 2009, after reviewing a proposed PPM, Flannery told WRAGG and KNORR: "In general, there is just too much hype.   You can't sell securities the way you sell other products.   Any sales material has to be calm and conservative." Regarding the extravagant returns WRAGG and KNORR promised to investors, Flannery wrote: "I am very uncomfortable stating returns.   Is this on an annual basis?"   Flannery continued, "I don't think you want to make any representations regarding an 85% return.   Profits and returns must always be stated at the low end of the possible range."   In a second example, Flannery

marked up a March 17, 2009 "Executive Summary" of the Mantria Industries Biochar

Receivables Factoring Program with bold print "TOO MUCH HYPE".   Other notes on the same

document read, "Never use exclamation points," "Timeline is too aggressive," and questioned

one representation with a note "Is this true?"   Moreover, Flannery questioned WRAGG if

Mantria was paying MCKELVY commissions to sell investments in Mantria.   WRAGG lied

and told Flannery no.   Flannery told WRAGG that any commissions to MCKELVY would be

illegal because he was not licensed to sell securities and such commissions were required to be

disclosed in the PPMs.   Thereafter, WRAGG hid from Flannery the millions of dollars of

commissions being paid to MCKELVY.   In sum, WRAGG and KNORR ignored Flannery's

legal advice and proceeded as planned with the false representations and material omissions in

the securities offerings.

> **E.      Green Energy**

Knowing that the two-year real estate contracts were ticking time bombs which would

destroy Mantria, WRAGG needed a new scheme to generate investor interest and enthusiasm in

Mantria and keep the cash flowing into the Ponzi scheme before it crashed.   With oil prices

climbing over $140 per barrel, WRAGG, KNORR, and MCKELVY jumped on the "green

energy" wave that was sweeping across the country during that time period.   Initially, WRAGG

latched onto the green energy ideas as a way to market the real estate in Tennessee as a "green"

community.   WRAGG later met Michael Lurvey who ran a company called Carbon Diversion,

Inc. ("CDI").   Lurvey claimed that he had a license from the University of Hawaii to use and

develop their carbon diversion systems.   The carbon diversion systems took certain forms of

biomass and using the right combination of heat and pressure, turned the biomass into a product

known as biochar, which is similar to charcoal.   Depending on the quality, the biochar could be sold for a profit and used in various applications.   Lurvey was exploring ways to use the carbon diversion systems in Hawaii to convert Macadamia nut shells into biochar.

WRAGG saw potential for using the same systems for Mantria.   WRAGG knew that thousands of acres of forest in Tennessee would be cleared if his real estate was ever developed. Mantria began investing millions of dollars of new investor funds into CDI.   Mantria and CDI began two different projects.   First, Mantria and CDI planned to develop a biochar facility on the land Mantria owned in Dunlap, Tennessee.   According to WRAGG, the Dunlap facility would turn the surrounding forest into profitable biochar.   Second, Mantria and CDI would build a carbon diversion systems factory in Carlsbad, New Mexico to build the machines which made the biochar.   Like the real estate developments, WRAGG, KNORR, and MCKELVY began soliciting investments in these "green energy" projects by making false representations to potential investors, omitting material facts, and wildly exaggerating the extent of their operations.

After listening to the sales pitches of WRAGG, MCKELVY, and KNORR, investors threw millions of dollars into these green energy projects believing that Mantria was on the cusp of a revolutionary technology.   WRAGG and MCKELVY portrayed Mantria as the next Microsoft – a company which would change the world and make every investor fabulously wealthy.   The defendants attempted to raise more than $100 million in securities investments. Between 2008 and 2009, WRAGG, KNORR, and MCKELVY raised a total of $54 million in 12 different securities offerings from more than 300 different investors.   Some investors "rolled-over" funds from one group to the next, such as from a real estate fund to a green energy fund.

14

The chart below represents only new money coming into Mantria bank accounts and excludes any money "rolled-over" from one investment to the next.   Moreover, there were additional securities offerings by Mantria that apparently did not raise any money.

| Name of Offering | Amount Raised |
|---|---|
| Mantria Corp. 5% | $61,300.80 |
| Mantria Renewable Energy Fund | $2,254,811.01 |
| Carbon Diversion Carlsbad New Mexico Manufacturing Plant | $1,299,094.42 |
| Mantria Financial | $15,565,121.99 |
| Mantria Industries 25% Sale of Profits Interest – Hohenwald | $9,246,424.81 |
| Mantria Industries 25% Sale of Profits Interest - Mantria Place | $2,111,155.25 |
| Mantria Real Estate Opportunities Group I | $1,631,511,68 |
| Mantria Industries 25% Profits Interest in System Sales | $612,000.00 |
| Mantria 50 | $8,824,498.06 |
| Mantria Diversification | $2,331,345.55 |
| Mantria Renewable Energy Site Development | $2,115,000.00 |
| Alden View Funding | $2,569,225.00 |
| Trust Deed Group 1 | $5,700,000.00 |
| Other Private Money | $210,000.00 |
| **TOTAL** | **$54,531,488.57** |

In pitching Mantria to prospective investors, WRAGG, KNORR, and MCKELVY stated that Mantria was making huge profits in green energy sales, as high as 484% return on investment.   Unfortunately for these investors, the economic and scientific reality of the situation was far different than the situation presented by WRAGG, MCKELVY, and KNORR when soliciting investments.   While Mantria was pouring millions of dollars into CDI to support these projects, CDI was making very little progress.   In fact, CDI was making so little progress,

that in December 2008, the University of Hawaii withdrew their license.   In early 2009,

WRAGG accused Michael Lurvey of misappropriating Mantria funds and hired an investigator.

In the summer of 2009, Mantria took over CDI in a proxy fight.   This gave Mantria control over

CDI's green energy developments.

WRAGG and MCKELVY had told investors in May 2009 that the Dunlap plant was up

and running.   The truth of the matter was far from that.   In fact, the Dunlap plant had not even

been built.   In July 2009, WRAGG struck a deal with Cary Widener, the owner of High-Temp

Industries.   High-Temp Industries manufactured and supplied CDI with many of the

components for the carbon diversion system.   A mechanical engineer by trade, Widener agreed

to help get the Dunlap plant up and running.   Widener saw the Dunlap plant as a "science

experiment" for his company.   Widener believed that if he could get the Dunlap plant working,

then Mantria could sell the carbon diversion systems to other companies which would result in

profits for High-Temp Industries which sold Mantria the parts to manufacture and maintain the

machines.   Widener understood that the Dunlap plant itself would never be profitable.

WRAGG, KNORR, and MCKELVY touted the Dunlap plant as a fully functioning

facility generating tons of biochar per day.   They paid investors to travel to the Dunlap facility

to see the plant operate.   In reality, the Dunlap plant was nothing more than a Potemkin village

to give the appearance of production to investors.   The total amount of sales from the Dunlap

plant totaled a few thousand dollars for a few samples of product.   In a PPM dated July 31,

2009, to raise $3.75 million for 25% of the profits on Mantria Place Eternagreen Center,

WRAGG assured investors that the Dunlap facility "began operations on July 30, 2009" – which

of course was not true.   The PPM claimed that each investment will be "secured by real estate

with an appraised value of at least 100% of an Investor's initial investment" – the real estate of course was not worth that much and came with serious contingencies.   The PPM promised that over $2 million of these investor funds would be used for development and working capital – in reality these funds were used to pay "earnings" on prior investments.

From the start, the Dunlap plant was plagued by scientific and logistical challenges. When Widener went to Tennessee in July 2009, he expected the Dunlap plant to be nearly completed based upon what WRAGG had told him.   In reality, the building had not even been built.   There were no mechanical drawings.   There were no building drawings.   Widener and some engineers from CDI thereafter spent about three months in Tennessee building the Dunlap plant essentially from scratch.   By November 2009, the Dunlap plant had run a few test batches but was not producing a consistent and sellable product.

Contrary to WRAGG's and MCKELVY's representations to investors, to create biochar, the Dunlap plant needed a consistent feedstock to produce a consistent product.   WRAGG's idea to produce biochar from the Tennessee forest was not scientifically feasible because the trees came in many different varieties and densities.   As Widener explained, making biochar is similar to making any other kind of baked product – if you have inconsistent ingredients you will end up with inconsistent results.   To sell the biochar, they needed consistent and high quality results made from consistent and high quality feedstock.   The quality of the biochar in the test batches was not high enough for sale because the technology had not been perfected, again contrary to WRAGG's and MCKELVY's representations to investors.

The Dunlap plant also suffered from logistical problems.   The Dunlap plant was never designed to produce the large scale quantities of biochar that WRAGG promised.   There were

several additional problems with the Dunlap plant.   First, the plant was not capable of producing

the quality of biochar their potential customers required.   Second, the plant could produce a little

more than one ton of biochar per hour while WRAGG promised investors that the plant could

produce 10 tons per hour.   Per ton, biochar is relatively inexpensive, typically selling for $500

or less.   Biochar is expensive to transport, costing as much as $800 per ton.   The Dunlap plant

would have to produce millions of tons to generate the profits promised to investors.   Built on a

mountain top in rural Tennessee, trucks would have to access the plant on a narrow road.   It

would be impractical, if not impossible, to transport the tons of feedstock and biochar in and out

of the Dunlap plant to make it financially successful.   Knowing the logistical problems with the

Dunlap plant, WRAGG planned to build a second biochar facility in Hohenwald, Tennessee.

The Hohenwald plant would be built in an industrial park with easy access for trucks and close to

a railroad – a location much more suitable for this kind of production.

In a PPM to investors dated May 1, 2009, Mantria Industries LLC attempted to raise

$12.2 million to build a waste-to-energy plant in Hohenwald, Tennessee.   The PPM assured

investors that their investment was "backed by high quality real estate at a 2 to 1 ratio" of the

amount invested.   The PPM estimated the return on this investment at 233.28%.   The PPM

further stated, "Your investment is secured with collateral, so if we fail to provide the projected

ROI [Return on Investment] at the end of each year, you could then enact your collateral."

On August 31, 2009, a similar PPM sought to raise another $20 million for the

Hohenwald plant.   The PPM promised that Mantria would use this money for "working capital,

reserve funding, and expanding operations via construction of the Hohenwald Site."   This PPM

estimated 2010 profits at 38.97% and 2011 profits at 78.56%.   If the company went public, the

PPM estimated returns at 550.87%.   Like the other investments, the PPM promised that the investment was secured by real estate "at a 1 to 1 Ratio on your amount invested."   The PPM explained, "Your investment is secured with collateral, so if we fail to provide the projected ROI at the end of each year, you could then enact your collateral."   An accompanying powerpoint presentation written by WRAGG for potential investors explained that "our #1 focus here – expand operations organically via the sale of equity at a discount today."   On a slide titled "Revenue Streams," WRAGG stated that they were currently working with "the following Fortune 500 companies: Kraft, Republic Waste, Smuckers, Wal-Mart" – none of which was true. WRAGG explained that if "we go bankrupt" the investors' money is secured by a "1-1 ratio" of real estate – again without mentioning the serious contingencies on that collateral.

In a similar manner, WRAGG, KNORR, and MCKELVY circulated PPMs for securities to "build" a plant in Carlsbad, New Mexico which would construct the carbon diversion systems (which made the biochar) for resale.   WRAGG, KNORR, and MCKELVY raised about $2 million to build this plant.   According to the PPM submitted to investors dated March 15, 2009, the investment was to be used exclusively to build the Carlsbad plant.   The PPM stated that all "cash received will be held in trust to be used solely for the purposes described" in the PPM.

While WRAGG, KNORR, and MCKELVY took in millions of dollars in investments for the Hohenwald plant, all of those funds were diverted to keeping the Ponzi scheme going and the Hohenwald plant was never built.   In the same manner, while WRAGG, KNORR, and MCKELVY took in millions of dollars in investments for the carbon diversion systems plant in Carlsbad, New Mexico, those funds were diverted in the exact same manner and the Carlsbad plant was never built, even though investors were told that the plant was fully operational.

Although the economic and scientific reality of the situation was grim, WRAGG, KNORR, and MCKELVY were able to raise such fantastic sums because they presented a fantasy world to prospective investors.   MCKELVY told investors that they could make money simply by spreading the biochar onto fields because it pulled "toxins" out of the atmosphere – a claim which was preposterous.   WRAGG and MCKELVY told investors that the Dunlap plant would turn "trash into cash" by converting the consumer/household waste generated by the Mantria real estate developments into biochar.   WRAGG and MCKELVY told investors that the State of New York was going to put one of their carbon diversion systems in every county to turn "trash into cash."   Unfortunately for the investors, as a matter of chemistry, consumer waste cannot be made into biochar because there simply is not enough carbon in consumer waste and consumer waste is an inherently variable feedstock.   Mantria's carbon diversion systems were untested, unproven, and unprofitable which WRAGG, KNORR, and MCKELVY pitched to investors as tested, proven, and profitable.

In raising these funds, WRAGG, KNORR, and MCKELVY repeatedly lied about the economic state of Mantria and omitted material facts.   Some, but not all, of the key misrepresentations that they made included:

- That Mantria was exceedingly profitable.   Investors were told that Mantria was currently earning millions of dollars in real estate and green energy and investors could expect to earn as much as a 484% return on their investments in Mantria. In reality, Mantria had no profits and very little revenue.

- All investments in Mantria were secured by the Tennessee real estate on a "2 to 1" or a "1 to 1" ratio.   Investors were told that if Mantria went bankrupt, they

would not lose any money because they would get the real estate in Tennessee. Of course, Mantria vastly overstated the value of the land in Tennessee and their ownership of the land came with serious contingencies.   When Mantria was shut down by the SEC, most of the land had been taken back by its former owners and what little remained had little or no value.

- That Mantria's biochar production facility in Dunlap, Tennessee was in full production and earning substantial profits from the sale of biochar.   Investors were told lies such as "Mantria Industries is the world's largest manufacturer and distributor of biochar."   In fact, the Dunlap facility was never a full production facility and only produced some samples of biochar.   Moreover, Mantria's business plan was based upon an impossibility – "trash into cash."   It is scientifically impossible to turn consumer waste into biochar because there simply is not enough carbon.

- That Mantria's carbon diversion systems plant in Carlsbad, New Mexico had been built and that they had contracts to sell large numbers of systems to various customers.   In fact, the Carlsbad plant was never built and the money they raised to build the plant was used to pay investor "earnings" on other securities.

In addition, WRAGG, KNORR, and MCKELVY made numerous material omissions from their solicitations to investors, including but not limited to:

- They failed to tell investors that they were paying "earnings" to old investors with new investor funds.

- They also failed to tell investors that MCKELVY was receiving a commission of 12% to 15% of all new investor funds.   WRAGG and KNORR also received "points" or a percentage of later securities offerings which was not disclosed to investors.

- They failed to disclose to investors all the problems and contingencies with the Tennessee real estate.   A key part of their investment pitches to new investors was that if Mantria went bankrupt, their investments were secured by the Tennessee real estate.

- They failed to disclose to investors that the University of Hawaii revoked the right to use the patent on the technology which they intended to use to make biochar and to produce the carbon diversion systems.

The financial truth of Mantria was far different from the fantasy world pitched by WRAGG, KNORR, and MCKELVY as reality.   Mantria's actual revenues from the sale of land in Tennessee amounted to about $300,000 and they sold $7,500 worth of biochar samples from the Dunlap plant.   Neither the Hohenwald nor the Carlsbad plant were built and the money raised was used to pay "earnings" on other investments.   All of the purported "earnings" were in fact new investor funds.

### F.    The Investigation

In 2009, the SEC in conjunction with the Colorado Division of Securities began to investigate Mantria.   Through the course of the civil investigation and the subsequent FBI criminal investigation, the investigators obtained numerous recordings of WRAGG, KNORR,

and MCKELVY making sales pitches to prospective Mantria investors during which they made

false representations and material omissions.

### 1.    April 21, 2009 Radio Show

On April 21, 2009, AMANDA KNORR appeared on the Speed of Wealth internet radio

show to promote Mantria securities to potential investors.    During her appearance, KNORR

made several false statements and material omissions to tout Mantria.    First, KNORR claimed

that Mantria was able to "produce about 20% more product than other competitors" – which of

course was false because Mantria was not producing any product at that time.    KNORR falsely

alleged that Mantria was currently selling the biochar being produced at their facility in

Tennessee.    KNORR further falsely stated that a logistics company, Integra Core, was presently

handling the packaging and shipment of the biochar being produced in Tennessee.    KNORR

stated, "We actually have orders going out."    KNORR alleged that Mantria had orders going out

to Africa, Australia, and India – which was not true because the Dunlap plant was not even built.

In April 2009, the Dunlap plant was merely an idea in the head of WRAGG, KNORR, and

MCKELVY which they pitched to investors as reality.

### 2.    Speed of Wealth Seminar, May 7, 2009

On May 7, 2009, MCKELVY and WRAGG touted Mantria to potential investors at a

Speed of Wealth seminar in Colorado.    In the first half of the presentation, MCKELVY pitched

his plan for investors to withdraw money from other investments, overfund insurance policies,

and then take out the maximum possible loan.    MCKELVY's theory was that the investors

could make money on the spread between the loan (around 6%) and their other investments.

MCKELVY then began pitching Mantria.    MCKELVY did not have a license to sell securities

and he openly flaunted SEC rules.   MCKELVY stated that Speed of Wealth investors had "averaged between 17 and 100 percent annualized returns" investing with Mantria.   MCKELVY stated, "I get a hundred investments across my desk every month.   And I've did a few of them. I'm never doing any other investment except for Mantria."   MCKELVY stated that "I'm deeply involved in Mantria.   A lot of the things he's [WRAGG] talking about, I'm a partner with.   I look at the books.   I know where all the money is going."

After MCKELVY's presentation, WRAGG made a presentation to the investors and made a number of false statements and material omissions to induce them to invest.   WRAGG claimed that over the past 18 months, Mantria made $10.6 million in pre-tax profits for Speed of Wealth investors.   WRAGG stated that Mantria had over $100 million in assets.   WRAGG claimed that "70 percent of our assets are real estate assets based in the State of Tennessee." WRAGG stated, "when we talk about collateral and when we talk about security, ladies and gentlemen, you do not get any better than that."   WRAGG claimed that Mantria had a "very light and passive debt load."   WRAGG stated that Mantria owned 10,000 acres of land in Tennessee and that they were currently building a real estate community called Mantria Place. WRAGG admitted that the land was purchased for only $2,600 per acre.   WRAGG claimed that he was "developing" 4500 home sites on the property.   He claimed that he was "creating our own city."   He claimed that Mantria Place was "Tennessee's largest master plan community." WRAGG described Mantria's other investments and claimed that the average return on these investments for the past nine months had been over 248%.   WRAGG claimed that they had already "built the world's first biorefinery manufacturing plant in Carlsbad, New Mexico."

WRAGG claimed that the "estimated net profit" for Mantria in 2009 was $5.5 million. WRAGG claimed that the estimated rate of return for investors over three years was 134.50%.

Furthermore, WRAGG told the investors that they were investing in "something that's cash-flowing, something that has assets of over $104 million supporting it."   WRAGG promised that all of the investments would be collateralized with the "2 to 1 ratio" of real estate. WRAGG told the investors that if they did not get the promised returns, the investors "get to enact the collateral".   WRAGG promised investors a money-back guarantee that Mantria would buy-back their investments by December 31, 2011, if they were not fully satisfied.   WRAGG also stated that Mantria was "setting aside money to make sure that we can buy you back at the end of that time frame."   WRAGG stated that if Mantria went bankrupt, the investors would not lose any money because they had the collateral of the real estate investments.   Of course, WRAGG knew that all of these assertions were false.   WRAGG also knew that he was not giving the investors a complete and accurate picture of Mantria as he omitted many material facts about Mantria.   If the potential investors had known the truth about Mantria's financial condition and economic prospects, it is unlikely that any of them would have invested.

### 3.    Speed of Wealth Seminar, May 21, 2009

In the first half of the presentation, WAYDE MCKELVY pitched his plan for investors to withdraw money from other investments, overfund insurance policies, and then take out the maximum possible loan.   MCKELVY's theory was that the investors could make money on the spread between the loan (around 6%) and their other investments.   MCKELVY then began pitching Mantria.   MCKELVY suggested that Mantria was the next Microsoft and that the investors in the room would have the chance to get "stinkin, filthy rich" if they invested with

Mantria.   MCKELVY stated that Mantria's plan was to turn "trash" into "cash".   MCKELVY explained that Mantria was "on the cusp of a revolutionary technology that's going to change the world, and you guys can benefit from it by putting money in and getting stinkin' wealthy."   In introducing WRAGG to the audience, MCKELVY told the investors, "This is the biggest wealth-building opportunity that I believe has ever come across in your lifetime."

WRAGG then made his presentation pitching Mantria.   During the presentation, WRAGG made a number of false statements to the prospective investors.   WRAGG stated that Mantria was in a "full commercial state" of production.   He stated that Mantria had received "6,000 tons of preorders for our bioproducts."   WRAGG alleged that Mantria owned over 10,000 acres of land in Tennessee that they were "developing" into Tennessee's largest master-plan community.   WRAGG stated that early investors in Mantria had made "well over 100-percent return" in 2008.   WRAGG stated that Mantria "returned to Speed of Wealth students over $9.5 million in pretax profits."   WRAGG stated that even though he and KNORR were young, they had been in "business together for the last ten years."   WRAGG promised the investors that their investment would be collateralized "by real estate at a 2 to 1 ratio."   He later further explained that promise by stating, "Now, every dollar that's invested into this deal is at a 2 to 1 ratio, which means if you invest $50,000 or $25,000, - let's say $25,000, you're getting $50,000 of collateral, which is backed by high quality real estate."   WRAGG stated that if Mantria went bankrupt, the investment would still be secured by the real estate.

Moreover, WRAGG stated that Mantria's biochar production had experienced "tremendous growth" which "more than doubled in just this past month."   WRAGG bragged that EternaGreen was "rapidly becoming the industry-leading brand."   WRAGG stated that the

plant was producing "$6.2 million annually" with a single shift of production.   However, WRAGG stated that they planned to go to three shifts to triple production.   With triple shifts, WRAGG promised returns of 293% to the investors.

After WRAGG's presentation, MCKELVY spoke for a few minutes and made more false statements about Mantria.   MCKELVY claimed that the State of New York had "already ordered and signed a letter of intent" to purchase 62 waste disposal units from Mantria. MCKELVY also claimed that the investors "can get paid by just owning land and spreading this stuff [biochar] all over your field, because this stuff pulls the toxins out of the atmosphere." MCKELVY further alleged that Mantria was the only biochar producer which would "burn all waste" and "could turn trash into biochar is 40 minutes."   MCKELVY stated that the competition's biochar units cost $13 million to build, while Mantria's biochar units only cost $3.5 million and were "portable".   MCKELVY claimed that the machines were small enough to be put on the back of a garbage truck.   MCKELVY further claimed that they had "a backlog of machines already ordered" and that Mantria could not manufacture the biochar machines fast enough to keep up with sales.   MCKELVY falsely claimed that the Carlsbad, New Mexico plant was currently under construction to build more biochar machines.

Again, all of these assertions by WRAGG and MCKELVY were patently false.   Neither WRAGG nor MCKELVY painted an honest picture of Mantria for the prospective investors, for if they had, it is highly unlikely that any of them would have invested.   WRAGG, KNORR, and MCKELVY had to dupe prospective investors with false representations and material omissions about Mantria's economic condition and financial prospects to convince them to invest.

    **G.**    **SEC Action**

In November 2009, the SEC initiated civil proceedings against Mantria in U.S. District Court in Colorado and the Ponzi scheme collapsed.   Of the $54 million in investor funds, Mantria spent all but about $600,000.   The district court appointed a receiver to take control of Mantria's assets, liquidate them, and disburse whatever funds were available to the investors. Unfortunately for the investors, Mantria had very few assets.   The land in Tennessee was, and always had been, essentially worthless.   Most of the land was taken back by the original owners under the terms of the sales contracts – terms which had not been disclosed to the investors. The millions of dollars in profits and the $100 million in assets which WRAGG, KNORR, and MCKELVY used to dupe the victims simply did not exist.

Even after the SEC took action, WRAGG continued to solicit new investor funds and tried to keep the Ponzi scheme going.   On November 20, 2009, WRAGG sent a "FAQs" form to investors which provided false information to investors and pretended that Mantria was in business.   Regarding the biochar production, WRAGG stated that Mantria was "working on fulfilling the pending orders" for biochar.   Regarding the sale of carbon diversion systems, WRAGG claimed that "none of the parties we are in negotiations with have stepped away." WRAGG claimed that the Dunlap facility "is producing bio-char".   Furthermore, WRAGG claimed that "we are continuing system sales and biochar orders."    WRAGG stated that "revenue have come from the sale of land and limited sales of bio-char."   Finally, WRAGG claimed "We believe we used the investor funds for the purposes stated in the use of proceeds" and "We believe that we will be able to make all the investors whole".   WRAGG claimed that they had "significant assets in Real Estate and at the Mantria Place facility."   In sum, WRAGG blamed their financial problems on the SEC's seizure of their financial assets rather than his own

actions.   WRAGG continued to lull old investors and seek new investors until the district court

ordered Mantria into receivership on April 30, 2010.

The SEC and the FBI investigators queried dozens of Mantria investors.   Most of the

investor responses were similar.   The victims invested in Mantria because they were led to

believe by the defendants that Mantria was a successful business that generated substantial

profits.   The investors stated that they were not aware that any Mantria "earnings" were being

paid with new investor funds.   The investors were led to believe by WRAGG, KNORR, and

MCKELVY that their investments were safe and secure.   In particular, most investors noted the

fact that their investments were supposedly secured by real estate in Tennessee as a particularly

compelling reason to invest in Mantria.   The investors were not told about the serious

contingencies on or problems with the Tennessee real estate.   Only when Mantria went bankrupt

did the victims realize that the land in Tennessee was essentially worthless.   As a result, most

investors lost essentially their entire investment in Mantria.

In granting the SEC motion for summary judgment against WRAGG, KNORR, and

MCKELVY, the Honorable Christine M. Arguello of the United States District Court for the

District of Colorado found that Mantria amounted to nothing more than a Ponzi scheme.   In her

written opinion, Judge Arguello found that the defendants made material misrepresentations in

connection with offers and sales of Mantria's securities, including that: (1) Mantria generated

millions of dollars in annual profits when, in fact, Mantria generated no profits; (2) Mantria was

the world's largest manufacturer and distributor of biochar and that Mantria's biochar operations

were very profitable when, in fact, Mantria never sold any biochar and never made any revenues

from biochar; (3) Mantria built the world's first biorefinery plant in New Mexico when, in fact,

Mantria never built or operated such a facility; (4) Mantria's biochar manufacturing facility in Tennessee was producing $6.2 million annually when, in fact, the facility never generated any revenue; (5) Mantria paid investors through profitable ventures when, in fact, it paid investor returns using investors' money; and (6) Mantria was not a Ponzi scheme when, in fact, it was.

In granting the SEC's motion for a permanent injunction barring WRAGG, KNORR, and MCKELVY from future violations of securities laws, Judge Arguello found:

> [O]ver the course of approximately two years, Defendants raised more than $54 million from over 100 investors by egregiously, recklessly, knowingly, and shamelessly perpetrating a fraudulent scheme whereby they used misrepresentations, omissions, and blatant lies to induce unsuspecting and unwitting victim investors to liquidate the equity in their homes and take out bank loans to invest in Defendants' scheme, which was nothing more than smoke and mirrors. Thus, given the seriousness and extent of the violations and the degree of scienter required to establish and further the fraudulent scheme, the Court finds that entry of a permanent injunction is warranted.

In imposing a civil penalty on the defendants, Judge Arguello held: "Defendants repeatedly engaged in these acts for at least two years, during which time they preyed on unsuspecting and unwitting investors who liquidated their retirement accounts and risked their home equity only to have their life's savings washed away by Defendants' sociopathic greed. Thus, without question, Defendants' conduct is deserving of the most severe penalties available under 15 U.S.C. § 77t(d)."

## H.    Mantria Business Records

Mantria's business records unearthed during the SEC and FBI investigation showed that WRAGG, KNORR, and MCKELVY were well aware of Mantria's financial problems and the fact that their businesses were never profitable, contrary to their wildly profitable representations to investors.   Mantria's federal tax returns showed a $25,000 loss in 2006, a $27,000 profit in

2007, and a $3.8 million loss in 2008 – not the millions of dollars in profits reported to investors. While the defendant's told investors that Mantria held more than $100 million in assets, their own internal accounting reports reflected assets of less than $1 million as of December 31, 2008. Internal budget reports for Mantria showed that WRAGG, KNORR, and MCKELVY expected Mantria to lose over $1 million in the first half of 2009, contrary to what they told prospective investors.   These budget reports showed that Mantria was actually losing money faster than WRAGG, KNORR, and MCKELVY expected and showed an actual loss of more than $6 million in the first half of 2009.   If the investors had known the truth about Mantria's financial condition, it is unlikely that anyone would have invested.   WRAGG, KNORR, and MCKELVY had to lie to dupe the victims into investing in Mantria securities.

## I.      Substantive Counts

The indictment charges seven substantive counts of wire fraud.   The first six wire fraud counts pertain to commissions which Mantria paid MCKELVY for illegally raising funds for the fraudulent securities offerings. Count Eight pertains to a wire transfer to a title company in furtherance of the Ponzi scheme.

Count Two charges a September 18, 2009 wire in the amount of $40,625 from Mantria (WRAGG and KNORR) to Retirement TRACS, LLC, (MCKELVY) to pay MCKELVY his undisclosed commissions for raising funds for Mantria.

Count Three charges a September 10, 2009 wire in the amount of $37,458.57 from Mantria (WRAGG and KNORR) to Retirement TRACS, LLC, (MCKELVY) to pay MCKELVY his undisclosed commissions for raising funds for Mantria.

Count Four charges a September 9, 2009 wire in the amount of $34,375 from Mantria (WRAGG and KNORR) to Retirement TRACS, LLC, (MCKELVY) to pay MCKELVY his undisclosed commissions for raising funds for Mantria.

Count Five charges a July 31, 2009 wire in the amount of $200,000 from Mantria (WRAGG and KNORR) to Retirement TRACS, LLC, (MCKELVY) to pay MCKELVY his undisclosed commissions for raising funds for Mantria.

Count Six charges a July 9, 2009 wire in the amount of $68,750 from Mantria (WRAGG and KNORR) to Retirement TRACS, LLC, (MCKELVY) to pay MCKELVY his undisclosed commissions for raising funds for Mantria.

Count Seven charges a July 1, 2009 wire in the amount of $87,500 from Mantria (WRAGG and KNORR) to Retirement TRACS, LLC, (MCKELVY) to pay MCKELVY his undisclosed commissions for raising funds for Mantria.

Count Eight charges a June 11, 2009 wire transfer in the amount of $46,078.43 from Mantria to a title company in Tennessee to "purchase" real estate.   As described above, Mantria used new investor funds to "buy" real estate in Tennessee to which Mantria already held title in order to create a real estate bubble for this undeveloped and worthless land.

### J.     MCKELVY's KNOWLEDGE

The government will prove that MCKELVY knew that Mantria was a Ponzi scheme and knew that his statements to investors and prospective investors to get them to invest in Mantria were false and misleading.   During the course of the SEC investigation, MCKELVY testified under oath on two occasions about his knowledge of Mantria.   In so doing, MCKELVY admitted his own criminal conduct.

### 1.    October 22, 2009 Testimony

On October 22, 2009, MCKELVY testified before the SEC.   Notably, his testimony on this occasion occurred *before* the SEC shut down Mantria in November 2009.   During his testimony, MCKELVY admitted that he owned 51% of Retirement TRACS, LLC, and his then wife, Donna McKelvy, owned the other 49%.   MCKELVY stated that he owned a percentage of Mantria Industries as well.   When the SEC attorney asked him how he acquired his interest in Mantria Industries, MCKELVY replied: "Because Troy [WRAGG] and I are very, very close friends.   We have become very, very close friends, sweat equity.   He realized that without me he probably wouldn't be where he is out today, and he wanted to make things right.   It was a conscious decision on his part."   MCKELVY explained that WRAGG told him that WRAGG "would not be where he is today if it hadn't been for me going out there and believing in him and believing in what they were doing and helping them raise money."

The SEC attorney then asked MCKELVY what was the value of his ownership in Mantria Industries.   Contrary to his representations to investors that Mantria was a profitable company with substantial assets backing their investments, MCKELVY replied that the value of his ownership was "squat at this point."   MCKELVY explained that Mantria's biochar program was only in the "test stages" and opined that Mantria Industries was not worth anything "until it comes to fruition."   MCKELVY acknowledged that other Mantria investments, such as Mantria Records, also were not producing revenue.   MCKELVY commented, "Until they start making real revenue, I don't think it is worth anything."   When asked the value of the real estate in Tennessee which Mantria allegedly owned, MCKELVY responded, "in my opinion, zero." MCKELVY stated that the land had been appraised at $100 million, "but until it sells, I think it is

worth nothing."   Again contrary to his representations to putative investors that Mantria made substantial money selling real estate, when asked how much real estate Mantria had sold, MCKELVY replied, "I have no idea."

Later in his testimony, the SEC inquired about the fees MCKELVY charged to investors. When asked if MCKELVY disclosed those fees to investors, MCKELVY replied, "No." MCKELVY explained, "they are very much aware I make fees, they just don't know how much."   MCKELVY further admitted that he does not explain to potential investors at every seminar the fact that he earns fees.   MCKELVY stated that he only mentions fees, "just when it crosses my mind."

One of the defenses which the defendant raised in his pretrial pleadings was that Mantria Financial was not a financial institution.   In his October 2009 testimony before the SEC, MCKELVY admitted that he knew that Mantria Financial was a financial institution.   When questioned about one of the investments known as Mantria 17, MCKELVY replied, "my understanding is that Mantria 17 is paid by home site owners that are financed through Mantria Financial."   MCKELVY elaborated, "Mantria 17 is a Tennessee financial institution, a commercial bank . . . .   Mantria 17 was its own banking system, bank, to sell homes sites."

In his October 2009 SEC testimony, MCKELVY also admitted that he knew that Mantria had not sold any biochar because Mantria was still testing the biochar making systems – contrary to his representations to prospective investors.   Specifically, MCKELVY stated that Mantria had received "a lot of inquiries, but we are holding off on orders until we go through our tests." Regarding who had placed an order for biochar, MCKELVY admitted, "Nobody has put an order in to my knowledge."   MCKELVY further stated that he knew that Mantria had not sold any

biochar in the past because "we couldn't produce it."   When asked about biochar products

generally, MCKELVY admitted, "We haven't sold anything.   We just have inquiries, but we

haven't taken any orders."

MCKELVY also discussed his knowledge of Mantria's patents on the biochar technology

in his October 2009 SEC testimony.   The SEC attorney asked MCKELVY point blank, "have

you ever told investors that in fact patents have been issued?"   MCKELVY either lied or failed

to remember his prior statements to prospective investors (for example, on the May 21, 2009

recording) and replied, "I've never said that.   I've heard I said that, but I have never said that

because it is false.   Patents have never even been applied for by CDI."   The SEC attorney then

pointed to the transcript of the May 21, 2009 recording where MCKELVY told the audience that

the technology "is patented."   Once confronted, MCKELVY admitted that his statement "was a

blatent lie."

In his October 2009 testimony, the SEC also asked MCKELVY about his statements to

prospective investors that one or more Mantria entities was preparing to "go public" through an

initial public offering.   MCKELVY admitted that he knew that Mantria had taken "absolutely

[no steps] at this point."   MCKELVY explained, "We have to get results.   We have to see the

company build.   You don't go public until you have something to go public with."   Contrary to

his representations to prospective investors, MCKELVY noted, "We don't have the sales.   We

don't have the bio refining sales, the system sales."

Towards the end of his testimony, the SEC attorneys made further inquiries into

MCKELVY's assets.   Again, this testimony was taken in October 2009, while Mantria was still

operating and before the SEC shut it down.   The SEC attorney asked him to estimate his net

worth.   MCKELVY stated that on "paper" his net worth was between $5 million and $10

million when accounting for his interest in various Mantria entities.   However, MCKELVY

admitted that his "real net worth" was "probably *zero*."   In so doing, MCKEVLY admitted that

he knew that Mantria and Mantria's investments were not actually worth $100 million as he and

WRAGG told investors that they were worth.

  Finally, the SEC attorneys asked MCKELVY about his living expenses.   MCKELVY

admitted that he was spending $30,000 per month from his share of the fees generated by

Mantria investors.   MCKELVY explained that he spent the $30,000 per month on "Living

expenses.   I have rent of $8,000, I have a car payment of $2,000.   I have got car payments.   I

have groceries.   I have got entertainment.   Taxes to pay."   The SEC attorney then asked,

"$30,000 a month is a lot of groceries, would you agree with that, Mr. McKelvy?"   To which,

MCKELVY replied, "Oh yes, I live good."   MCKELVY explained, "Yes, I don't save money. .

. .   I spend every dime I make."

### 2.  November 19, 2010

  On November 19, 2010, the SEC took MCKELVY's deposition in the civil securities

fraud case in Denver.   Notably, this testimony took place approximately one year after the SEC

shut down Mantria in November 2009.

  During this testimony, MCKELVY again addressed the issue of his knowledge that

Mantria Financial was a financial institution under Tennessee law.   Specifically, the SEC

attorney asked MCKELVY about TROY WRAGG's real estate development.   MCKELVY

stated, "I will go on the record as saying I thought it was a good idea for him [WRAGG] to start

his own bank [Mantria Financial] to move the property as long as the value was the in the underlying property."

The SEC also asked MCKELVY about the fees he made for raising money for Mantria. The SEC attorney stated that they had computed that MCKELVY made about $6.2 million in fees over three years.   To which, MCKELVY responded, "In three years, yes, that's probably pretty accurate."

The SEC also asked MCKELVY what information he had regarding the profitability of Mantria's operations.   MCKELVY replied that he had received some "pro formas" from WRAGG.   MCKELVY then stated, "I know they weren't profitable."   MCKELVY further stated, "I don't think there was any biochar production."

Finally, the SEC asked MCKELVY about Mantria being a Ponzi scheme.   MCKELVY explained that he did not believe that Mantria was a Ponzi scheme, even though he knew that Mantria was not profitable, he was living lavishly off the $6.2 million in commissions, and he was using new investor money to pay "returns" to earlier investors.   The SEC asked MCKEVLY, "how would you define a Ponzi scheme?"   MCKELVY replied, "a Ponzi scheme is something that when you're going out and telling people you're going to reinvest their money for them, you're taking in money, you're living lavishly off the money, and as new money comes in, you're just paying the returns out and telling them what returns they're getting" – exactly what MCKELVY was doing.

### 3.    June 7, 2007

The 2009 investigation was not the first time MCKELVY had been investigated by the SEC.   In 2007, the SEC investigated MCKELVY regarding his investment clubs which shortly

thereafter began investing in Mantria.   On June 7, 2007, MCKELVY testified before the SEC

and stated that he and his partner looked for investment opportunities and presented these

opportunities to the clubs "every week or every other week."   MCKELVY noted that many club

members were clients of his insurance business.   MCKELVY stated, "We do a lot of due

diligence.   And once we are comfortable introducing an investment opportunity the club is

called together on a teleconference.   I will introduce them to the opportunity, tell them the

details, the positives, the negatives of the opportunity, and my part is done."   MCKELVY

explained that investment opportunities were "not hard to find."   MCKELVY noted that, "I

understand real estate very well."   MCKELVY estimated that his clubs added "four to seven"

new members and month and each investor contributed, on average, about $100,000.   Regarding

Retirement TRACS LLC (the entity to which Mantria paid MCKELVY his $6.2 million in

undisclosed commissions), MCKELVY admitted that, "It's my entity."

## IV.   EVIDENCE

In order to prove these charges, the government intends to call approximately 30

witnesses and introduce dozens of exhibits.

### A.   Victims

Of the more than 300 victims of this fraud, the government plans to call about 10 victims

to testify at trial as representatives all the victims.   Most of the victims have a very similar story

to tell.   The victims will share the lies which MCKELVY, WRAGG, and KNORR told them in

order to get them to invest in Mantria.   The victims were told that Mantria was a very profitable

company selling real estate and biochar.   The victims were told that their investments were

guaranteed by the real estate in Tennessee.   Moreover, the victims will also share what they

were not told about Mantria.   They were not told about the contingencies in the land.   They were not told that Mantria biochar was an unproven commodity.   The bottom line is that if the victims knew the truth about Mantria, they never would have invested.

### B.    Mantria Employees/Contractors

The government will also call a number of Mantria employees.   Contrary to what WRAGG, KNORR, and MCKELVY were telling investors, the government's evidence will show that Mantria was on the verge of bankruptcy.   Mantria was not making any money.   The only money coming in was the new investor funds.   Moreover, Mantria was spending that money as fast as it came in the door.   A large portion of the victims' money was spent paying MCKELVY's fees, paying earlier investors, and pretending to be a successful company.

### C.    Law Enforcement

The government will also call several witnesses who investigated these crimes.

Jerry Lowe worked for the Colorado Division of Securities.   Lowe recorded at the two conferences in May 2009 during which WRAGG and MCKELVY made false statements and material omissions to prospective investors.   The government will play portions of these recordings to the jury at trial.

Kurt Gottschall was one of the SEC attorneys who investigated this fraud.   While the government does not intend to call Gottschall as an expert witness pursuant to Rule 702 of the Federal Rules of Evidence, he will testify about the facts of this case.   He will explain the SEC's investigation to the jury and the various concepts applicable to that investigation.   For example, he will explain what a "PPM" is.   He will explain what an "accredited investor" is and why only "accredited investors" should have invested in Mantria's PPMs.   He will explain to the jury the

SEC's licensing procedure in order to sell securities.   He will inform the jury that WAYDE

MCKELVY was not licensed to sell securities.[2]   In addition, Gottschall will authenticate

numerous documents provided to the SEC by Mantria, including certain e-mails between

MCKELVY, WRAGG, and KNORR.   Gottschall will authenticate the three depositions

provided by MCKELVY to the SEC and other statements he submitted.

John Paul Anderson was the receiver appointed by the United States District Court in

Colorado to take over Mantria.   Anderson will testify to his efforts to try to recoup funds for the

investors out of Mantria's assets.   Anderson will testify that Mantria had virtually no assets.

Anderson attempted to sell the land in Tennessee, however, the land turned out to be worthless.

Despite pouring millions of investor dollars into the biochar technology, Mantria had not

successfully developed anything valuable.   Anderson will help the government to establish that

Mantria was nothing more than a Ponzi scheme.

### D.      Amanda Knorr

Co-defendant AMANDA KNORR has pleaded guilty to all 10 counts in the indictment.

KNORR will explain the lies she told, TROY WRAGG told, and WAYDE MCKELVY told the

victims in this case in order to keep the Mantria Ponzi scheme alive and operating.   KNORR

will also explain the material facts which she, WRAGG, and MCKELVY hid from the victims.

---

[2]      The fact that MCKELVY actively evaded SEC scrutiny is relevant to his good faith or
lack thereof.   MCKELVY admittedly broke SEC rules in selling securities without a license.
The government intends to argue that this fact, among other facts, proves that MCKELVY did
not act in good faith.

## V.   LAW

### A.   Conspiracy

To prove a violation of 18 U.S.C. § 371 (conspiracy), the government must prove the following elements beyond a reasonable doubt:

1. the defendant conspired with at least one other person to do an unlawful act, in this case to commit securities fraud;

2. the defendant did so knowingly and willfully; and

3. an overt act was knowingly committed in furtherance of the conspiracy.

### B.   Wire Fraud

To prove a violation of 18 U.S.C. § 1343, the government must prove:

1. The defendant devised a scheme to defraud or to obtain money or property by materially false or fraudulent pretenses, representations or promises;

2. The defendant acted with the intent to defraud; and

3. That in advancing, furthering, or carrying out the scheme, the defendant transmitted any writing, signal, or sound by means of a wire, radio, or television communication in interstate commerce or caused the transmission of any writing, signal, or sound of some kind by means of a wire, radio, or television communication in interstate commerce.

### C.   Securities Fraud

[W]hen a person desires to purchase a new car, appliance or a head of lettuce he can pretty well tell the quality of the product by examination and the reasonableness of the price, but . . . an investor purchasing a security must rely on the representations of the company as to its assets, management and products in determining the reasonableness of the price asked. For that reason [the federal securities statutes] require registration of securities based on reliable information with respect to the company or the security and prohibit fraudulent or deceptive practices . . . .

41

United States v. Bartlett, 449 F.2d 700, 704 (8th Cir. 1971).

Title 15, United States Code, Sections 78j(b) and 78ff; and 17 C.F.R. § 240.-10b-5 together constitute the criminal securities fraud enforcement mechanism.   To establish a violation of these statutes, the government must prove the following elements beyond a reasonable doubt:

1.      The defendant did any one or more of the following, as charged in the indictment:

        (a)      knowingly employed a device, scheme, or artifice to defraud; or

        (b)      knowingly made an untrue statement of a material fact, or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

        (c)      knowingly engaged in a transaction, practice or course of business that operated or would operate as a fraud and deceit on any person;

2.      The defendant did so in connection with the purchase or sale of a security;

3.      In connection with the purchase or sale of a security, the defendant made use of or caused the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange; and,

4.       The defendant acted knowingly, willfully, and with the intent to defraud.

**D.      Definitions**

**1.      Security**

The term "security" means any note, stock, treasury stock, security future, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate

42

or subscription, transferable share, investment contract, voting-trust certificate, certificate of

deposit for a security, any put, call, straddle, option, or privilege on any security, certificate of

deposit, or group or index of securities (including any interest therein or based on the value

thereof), or any put, call, straddle, option, or privilege entered into on a national securities

exchange relating to foreign currency, or in general, any instrument commonly known as a

"security"; or any certificate of interest or participation in, temporary or interim certificate for,

receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not

include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity

at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal

thereof the maturity of which is likewise limited.   15 U.S.C. § 78c(a)(10).

In determining whether or not an instrument is a security, courts frequently apply the

Supreme Court's Howey "investment contract" analysis (from SEC v. W.J. Howey, 328 U.S.

293, 301 (1946)).   The Howey elements of an investment contract are:

1.      An investment of money.   This element is met when an investor undertakes some

element of economic risk.   Steinhardt Group v. Citicorp, 126 F.3d 144, 151 (3d Cir. 1997).

2.      In a common enterprise.   This element requires a pooling of investors'

contributions and distribution of profits and losses on a pro-rata basis among investors.

Steinhardt, 126 F.3d at 151.

3.      With profits to come solely from the efforts of others.   Courts generally have

"refused to read literally the term 'solely' when evaluating the efforts of the investor." Steinhardt,

126 F.3d at 153, quoting Lino v. City Investing, 487 F.2d 689, 692-93 (3d Cir. 1973).   An

investment contract can exist where the investor is required to perform some duties, as long as

these duties are nominal or limited and have little direct effect upon whether the investor realizes a profit. <u>Lino</u>, 487 F.2d at 692-93.   The critical inquiry is whether the efforts made by those other than the investor are the undeniably significant ones which affect the failure or success of the enterprise. <u>SEC v. Glenn W. Turner Enterprises</u>, 474 F.2d 476, 482 (9th Cir. 1973), quoted in <u>Steinhardt</u>, 126 F.3d at 152.

### 2.    "Material"

Rule 10b-5 uses the word "material" in subsection (b).   "Material" in this sense means that the fact misstated or the fact omitted was of such importance that it would reasonably be expected to cause or to induce a person to invest or to cause or to induce a person not to invest. A fact is material only if there is a substantial likelihood that a reasonable investor would have viewed the fact as having significantly altered the total mix of information available.   Whether a public company's stock price changes sharply shortly after information is disclosed to the investing public is a factor that may be considered by a jury in determining whether or not information is material. As a result, evidence of the magnitude of a drop in stock price is relevant to show materiality. A conservative view is that only the drop in the price of an individual share—as opposed to the overall market capitalization loss—is relevant to materiality.   Proof of reliance on the material misrepresentation or omission is not an element of criminal securities fraud or a fraud case brought by the SEC.   It is, however, an element of a private civil case alleging securities fraud.

## VI.    <u>CONCLUSION</u>

At the conclusion of the trial, the government's evidence will prove beyond a reasonable doubt that the defendant WAYDE MCKELVY is guilty of all ten offenses charged in the indictment.

Respectfully submitted,

WILLIAM M. McSWAIN
United States Attorney


_____/s/_____
ROBERT J. LIVERMORE
SARAH M. WOLFE
Assistant United States Attorneys

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served upon the

following:

Walter Batty, Esq.
William Murray, Esq.
Counsels for WAYDE MCKELVY

_____/s/_____
ROBERT LIVERMORE
Assistant United States Attorney
