IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.

WAYDE MCKELVY,

　　　　　　　　Defendant.

CRIMINAL ACTION
NO. 15-398-3

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................3

II.     BACKGROUND ....................................................................................................5

　A.  The Indictment.......................................................................................................5

　B.  Summary of the Evidence Presented at Trial ....................................................9

　C.  Defendant's Motions ...........................................................................................11

III.    STANDARD OF REVIEW ...............................................................................13

　A.  Rule 29 Motion for Judgment of Acquittal......................................................13

　B.  Rule 33 Motion for a New Trial ........................................................................14

IV.     ANALYSIS............................................................................................................14

　A.  Defendant's Motion for Judgment of Acquittal Pursuant to Rule 29 Will Be Denied. .....15

　　1.  The Government Presented Sufficient Evidence to Show that the
　　　  Extended Ten-Year Statue of Limitations for Wire Fraud Applies................15

　　　a.  Mantria Financial was a "Financial Institution" That Was Affected
　　　　  By The Mantria Ponzi Scheme. ................................................................16

      b.    Other Financial Institutions ........................................................................20

  2.    Defendant Withdraws Argument Regarding Overt Act Component
      of Counts 9 and 10..........................................................................................21

  3.    The Government Has Proved an Overall Conspiracy to Commit Wire Fraud
      and Securities Fraud, and Schemes to Engage in Wire and Securities Fraud. ..............21

      a.    The Government Proved that the Investments Were Securities. ...............................21

      b.    The Government Was Not Required to Prove That Defendant Acted as a Broker....29

      c.    The Government Proved Defendant's Fraudulent Intent to
          Participate in the Offenses Charged. ..........................................................30

      d.    The Government Proved the Existence of a Conspiracy. ...........................................32

B.    Defendant's Motion for a New Trial Pursuant to Federal Rule of Criminal
    Procedure 33 Will Be Denied. ...........................................................................34

  1.    The Government Presented Sufficient Evidence of Defendant's
      Fraudulent Intent. ........................................................................................34

  2.    Defendant's Arguments Regarding Securities Fraud Are Without Merit. ...................36

  3.    The Good Faith Jury Instruction Was Correct..............................................................38

V.      CONCLUSION ........................................................................................40

**OPINION**

Slomsky, J.                                                              October 9, 2020

## I.  INTRODUCTION

This case involves an elaborate Ponzi scheme, known as the "Mantria Ponzi scheme," which received more than $54 million of fraudulently obtained new investor funds.  Mantria[1] itself was one corporation among many that were used to carry out the scheme.  The perpetrators behind the scheme were Defendant Wayde McKelvy ("Defendant" or "McKelvy") and co-defendants Troy Wragg and Amanda Knorr, who promised investors large returns for securities investments in supposedly profitable business ventures in real estate and green energy.  In reality, however, Mantria and its related entities[2] were used to commit a Ponzi scheme in which new investor money was used to pay "returns" to early investors, and the businesses that made up Mantria generated meager revenues and no actual profits.

On September 2, 2015, a grand jury returned a ten-count Indictment charging Defendant McKelvy, and Wragg and Knorr, with conspiracy to commit wire fraud, in violation of 18 U.S.C.

_____

[1]   The Indictment describes Mantria as follows:

> Mantria Corporation ("Mantria") was a Delaware corporation with its principal place of business in Bala Cynwyd, Pennsylvania.  Mantria claimed to earn millions of dollars in earnings from selling real estate and "green energy" products. Mantria purported to contain 11 operating divisions, 32 wholly-owned or affiliated companies, and other related entities including Mantria Place, Mantria Financial, Mantria Real Estate, Carbon Diversion, Inc., EternaGreen Global Corporation, Clean Energy Components, Earthmate Technologies, Mantria Industries, Mantria Renewable Energy Fund, and Mantria Communities.

(Doc. No. 1 ¶ 1.)

[2]   When "Mantria" is referred to in this Opinion, unless otherwise noted, it refers to Mantria Corporation and its related entities.

§ 371[3] (Count 1); wire fraud, in violation of 18 U.S.C. §1343[4] (Counts 2-8); conspiracy to commit

securities fraud, in violation of 18 U.S.C. § 371 (Count 9); and securities fraud, in violation of 15

U.S.C. §§ 78j(b), 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2 (Count 10).  (Doc. No. 1.)  On

October 12, 2018, following a fourteen-day trial, a jury convicted McKelvy on all ten Counts of

the Indictment.[5]  Before the Court is McKelvy's Motion for Judgment of Acquittal Pursuant to

Federal Rule of Criminal Procedure 29(c) (Doc. Nos. 228, 262), and McKelvy's Motion for a New

Trial Pursuant to Federal Rule of Criminal Procedure 33 (Doc. Nos. 229, 263).

---

[3]   18 U.S.C. § 371 provides as follows:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

[4]   18 U.S.C. § 1343 provides as follows:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5122)), or affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

[5]   Co-defendants Wragg and Knorr entered guilty pleas to all ten Counts of the Indictment.

## II.  BACKGROUND

### A.  The Indictment

On September 2, 2015, a federal grand jury in the Eastern District of Pennsylvania returned a ten-count Indictment charging Defendant McKelvy and co-defendants Wragg and Knorr for their roles in the Mantria Ponzi scheme.  (See Doc. No. 1.)  Co-defendant Wragg was the co-founder, chairman of the board of directors, and chief executive officer of Mantria, and co-defendant Knorr was the co-founder, president, vice-chairman of the board of directors, and chief operating officer of Mantria.  (Id.)  Defendant McKelvy operated companies named "Speed of Wealth LLC" and "Retirement TRACS LLC," both of which were Colorado companies.  (Id. ¶ 2.)  McKelvy ran Speed of Wealth seminars advising investors to invest funds in Mantria and its related entities. (Id.)

Mantria Financial, one of the Mantria entities, was licensed in Tennessee to finance real estate mortgages.  (Id. ¶ 5.)  Mantria Financial issued unregistered securities that Defendants sold to investors in Colorado and elsewhere.  (Id.)  Defendants then used the funds raised by Mantria Financial to purchase or finance mortgages for undeveloped real estate in Tennessee owned by Mantria or its subsidiaries to generate paper profits for Mantria and inflate the value of the undeveloped land.  (Id.)  Defendants used the proceeds from the land "sales" for other Mantria-related business and their own personal enrichment.  (Id.)

Mantria performed small improvements to the Tennessee real estate to give the appearance of development to investors.  (Id. ¶ 6.)  Mantria built some roads, one model home, and an entrance gateway.  (Id.)  It also had some of the real estate surveyed.  (Id.)  The development, however, was never completed, no residences were built, and most of the real estate lacked a supply of potable water.  (Id.)

By the end of 2008, Mantria curtailed the modest improvements to the real estate and began to focus on "green energy" products.  (Id.)  Mantria acquired an interest in Carbon Diversion, Inc., a company that initially held a license to manufacture "biochar," a charcoal-like product.  (Id.)  Mantria began construction on a "biochar" facility in Dunlap, Tennessee, and investors were told that the Dunlap facility was a full production facility.  (Id.)  In reality, it was merely a facility that Mantria used to test and refine the machines Mantria was developing to make the biochar.  (Id.)  The Dunlap facility was used as a showpiece for investors and potential customers, but the machines did not consistently produce biochar of a sufficient quality to sell on the market.  (Id.)  Furthermore, the Dunlap facility was built in a remote location and lacked the logistical infrastructure to transport the tons of biochar necessary for the facility to be profitable.  (Id.)  Because of this, Mantria planned to build a second biochar facility in Hohenwald, Tennessee, which had better logistical access.  (Id.)  However, the Hohenwald facility was never built.  (Id.)  Mantria also solicited investments for a factory in Carlsbad, New Mexico, which would manufacture the machines to make biochar.  (Id.)  The Carlsbad facility also was never built.  (Id.)

The Indictment states that from approximately March 1, 2005 to April 30, 2010, Defendant, along with co-defendants Wragg and Knorr, induced more than 300 victims to invest approximately $54 million to purchase Mantria's and its related entities' unregistered security offerings.  (Doc. No 1 ¶ 9.)  To induce prospective investors, Defendants made materially false statements and omitted material facts to mislead the investors as to the true financial status of Mantria, including grossly overstating the financial success of Mantria and promising excessive returns.  (Id. ¶ 10.)  The Indictment alleges that Mantria had "virtually no earnings, no profits, and was merely using new investor money to repay earlier investors."  (Id. ¶ 11.)

To procure investors, Defendant McKelvy operated Speed of Wealth, LLC.  (Id. ¶ 12.)

Defendant advertised Speed of Wealth on the radio, the Internet, and other media outlets to "lure the general public to seminars he offered." (Id. ¶ 12.) At these seminars, Defendant advised prospective investors to liquidate other investments, including retirement accounts, and to obtain the maximum amount of money in loans from financial institutions in the form of credit cards, insurance policies, home equity, and other loans, and to invest these funds in Mantria and its related entities. (Id. ¶ 2.)

According to the Indictment, Defendant advised and assisted investors in pooling their investment funds "in an attempt to evade SEC regulations." (Id. ¶ 3.) Investors would then wire the funds to Mantria-controlled banks. (Id. ¶ 4.) In large part, after investors wired the money, Mantria Financial would use their money to finance mortgages on Mantria-controlled real estate. (Id. ¶ 5.) In return, investors would receive securities in Mantria and its entities. (Id. ¶ 4.) Investors were told that their investments were secured with the Tennessee real estate as collateral. (Id. ¶ 13(b).) Most of the individuals who invested in Mantria and related entities had attended Defendant's Speed of Wealth seminars. (Id. ¶ 4.)

Significantly, the Indictment alleges that Defendant made "materially false statements and omitted material facts to mislead investors as to the true financial status of Mantria, including grossly overstating the financial success of Mantria and promising excessive returns" on the money invested. (Id. ¶ 10.) The materially false statements to prospective investors were

    a.  That Mantria earned between 17% and 484% annually, although [Defendants] knew that Mantria in fact had virtually no earnings and no profits.

    b.  That Mantria investments were secured by real estate in Tennessee[,] which was worth twice as much as the investments, although they knew that the value of the real estate in Tennessee was substantially less and Mantria's interest in this property was contingent.

c.  That Mantria was currently producing large quantities of biochar, although they knew that Mantria was not producing large amounts of biochar.

d.  That Mantria had large amounts of "pre-orders" or imminent sales of biochar, although they knew that Mantria had no such imminent sales.

e.  That Mantria built a carbon diversion systems factory in Carlsbad, New Mexico[,] which had a substantial number of sales contracts to sell the finished systems, although they knew that no such factory was built and no such sales contracts were signed.

f.  That Mantria intended to turn consumer waste from the Tennessee real estate developments into biochar, well knowing that consumer waste lacked sufficient amounts of carbon to be turned into biochar.

g.  That Mantria was "not a Ponzi scheme," although [Defendants] knew that Mantria was just such a scheme paying investors' "earnings" with money raised from misled new investors.

(Id. ¶ 13.)

Defendants also omitted the following material facts in their representations to investors:

a.  That Mantria used a substantial portion of the new investor funds to make payments to old investors, all the while making the claim that these new investments were "earnings" of Mantria.

b.  That Mantria used a substantial portion of the new investor funds to pay "marketing" commissions to [Defendants], and others.  Most of these "marketing" commissions were sent via wire transfer.

c.  That there were significant undisclosed problems with the real estate in Tennessee, which served as the most significant asset of Mantria and was represented to investors as collateral for their investments. These problems included a lack of potable water, the possibility that some of the land contained unexploded artillery shells, the fact that their valuations were based upon a projection of the value of the land after it had been developed[,] which had not occurred, that Mantria would incur substantial expenses to develop the land, and the fact that Mantria's interest in the land was contingent upon selling the land to third parties.

d.  That Mantria did not have a patent for the technology for the biochar process or for the systems sales.  In fact, the license which they had

used was revoked in December 2008.

> e.   That Mantria was under SEC investigation.

(Id. ¶ 14.)

Ultimately, Defendants raised approximately $54.5 million from investors and paid investors approximately $17.5 million in "earnings," resulting in a net loss of approximately $37 million.  (Id. ¶ 15.)  In return for securing these funds from investors, Wragg and Knorr paid Defendant approximately $6.2 million in commissions.  (Id.)  Due in part to the fraudulent activities, the Securities and Exchange Commission ("SEC") commenced civil litigation in November 2009 against Mantria.  (Id.)

On May 24, 2016, Amanda Knorr pled guilty to all ten Counts in the Indictment.[6]  (Doc. No. 73.)  Likewise, on March 2, 2017, Troy Wragg pled guilty to all ten Counts in the Indictment.[7] (Doc. No. 96.)  But unlike his co-defendants, Defendant McKelvy entered a plea of not guilty on all Counts and proceeded to trial.  (See Doc. No. 28.)

### B.   Summary of the Evidence Presented at Trial

McKelvy's trial took place from September 24, 2018 to October 12, 2018 before a jury. During trial, the Government presented extensive evidence to prove McKelvy's participation in the Mantria Ponzi scheme and his criminal intent.  The Government called upwards of twenty

---

[6]   On April 5, 2019, Knorr was sentenced to thirty months' imprisonment, followed by five years' supervised release, and ordered to pay a $1,000 special assessment and $54,531,488.57 in restitution.  (Doc. No. 270.)

[7]   On August 21, 2019, Wragg was sentenced to 144 months' imprisonment, followed by five years' supervised release, and ordered to pay a $1,000 special assessment and $54,531,488.57 in restitution.  (Doc. No. 297.)  That same day, Wragg was sentenced in connection with another scheme.  See United States v. Troy Wragg, Crim. No. 18-465 (E.D. Pa., filed Oct. 24, 2018).

witnesses at trial, including victims of the scheme,[8] Mantria employees and contractors,[9] those who investigated Mantria,[10] and co-defendant Amanda Knorr.   (See Doc. Nos. 241-49.) Government witnesses, through testimony and exhibits, explained how McKelvy informed prospective investors in Mantria that it was a profitable and successful company that earned millions of dollars selling real estate and green energy products, and that Mantria investments posed no risk.[11]   The evidence demonstrated, however, that these representations were false because Mantria's purported "earnings" were merely new investor funds.[12]   The Government

---

[8]   Mantria's investors who testified included Deidra Holl, John Marvin, Phillip Russell Wahl, Charles Carty, George Anderson, Bruce Kalish, and Carla Madrid.

[9]   Among those who testified were Daniel Rink, an accountant for Mantria, Robert Volpe, a Mantria employee, and Christopher Flannery, an attorney for Mantria.

[10]   Those who testified were Kurt Gottschall, an attorney with the Securities and Exchange Commission ("SEC"), Jerry Lowe, an employee with the Colorado Division of Securities, and Carl Scott, an employee with the Tennessee Department of Financial Institutions.

[11]   For example, Deidra Hall testified as follows:

    Q:    Now with respect to the opportunities in Mantria, do you recall [McKelvy] giving any assurance about risks involved in the investment?
    A:    These were safe.  These were secure.  One particular investment was backed up by property in a development that they were going to have in Tennessee, a resort.

(Doc. No. 241 at 67-68.)

    Q:    Did [McKelvy] tell you the plants were up and running?
    A:    Yes. Yes. Money was rolling, money was rolling in so there was no question about this being a risk or my money being at stake.  I believed him.

(Id. at 88.)

[12]   Co-Defendant Amanda Knorr testified as follows:

    Q:    And what would happen to Mantria if Wayde McKelvy's investment group stopped investing in Mantria?
    A:    We'd go bankrupt.

(Doc. No. 245 at 165.)

presented to the jury that McKelvy's statements to investors were false, misleading, or contained material omissions; that Defendant knew they were false at the time he made them; and that he had the intent to defraud.  (Doc. No. 253 at 10.)

The defense argued at trial that the Government did not prove beyond a reasonable doubt that Defendant knew the true financial status of Mantria and company's profitability.  (Id. at 47.) Defense counsel claimed that no witness testified that Defendant knew what he was saying to the investors about Mantria was not true, nor was there evidence presented that he knew Mantria's true financial condition or that there were issues with the green energy technology.  (Id. at 48.) Defendant's argument relied on evidence that co-defendants Wragg and Knorr provided false information to Defendant.  (Id. at 48-51.)  Ultimately, the jury found Defendant guilty on all ten Counts of the Indictment.  (Doc. No. 223.)

## C.  Defendant's Motions

On October 26, 2018, Defendant filed the instant Motion for Judgment of Acquittal pursuant to Federal Rule of Criminal Procedure 29(c) (Doc. No. 228) and Motion for a New Trial pursuant to Federal Rule of Criminal Procedure 33 (Doc. No. 229).  The Court then entered an Order permitting Defendant to file supplemental memoranda in support of his post-trial Motions after obtaining the trial transcript.  (Doc. No. 231.)

On April 5, 2019, Defendant filed amended supplemental memoranda in support of his Motion for Judgment of Acquittal and his Motion for a New Trial.  (Doc. Nos. 262, 263.)  On May 3, 2019, the Government filed Responses in Opposition to Defendant's Motions.  (Doc. Nos. 274,

---

Furthermore, defense counsel, in his closing argument, conceded that "as I said in my opening, and is very clear from all the evidence here, Mantria was a Ponzi scheme."  (Doc. No. 253 at 49.)  As noted infra, he did so because McKelvy's defense at trial was that McKelvy was unaware that Wragg and Knorr were perpetrating a Ponzi scheme.  McKelvy so testified at trial and the jury by its verdict rejected his claim of lack of knowledge of the fraudulent conduct.

275.)  On May 22, 2019, Defendant filed Replies.  (Doc. Nos. 280, 281.)  Finally, on June 28, 2019, the Court held a hearing on the Motions.[13]  (See Doc. No. 288.)

In his Motion for Judgment of Acquittal, McKelvy argues the following: (1) the Government failed to trigger the ten-year statute of limitations for wire fraud under 18 U.S.C. § 3293(2) because it failed to prove that Mantria was a financial institution under the statute and failed to prove that any other financial institution was affected by the Mantria scheme to defraud; (2) the Government failed to prove that McKelvy had a duty to disclose his commission to investors, and therefore failed to prove any overt act in furtherance of the fraud within the six-year statute of limitations for securities fraud; (3) the Government failed to prove there was an overall conspiracy, wire fraud scheme, or a securities fraud scheme with McKelvy as a knowing participant; (4) the Government failed to prove that the Mantria investments, the subject of Counts 9 and 10, were securities; (5) and the Government failed to prove that McKelvy knowingly and intentionally sold the securities and acted as a broker.  (Doc. No. 262.)

In response, the Government argues that the evidence proved that the extended ten-year statute of limitations for wire fraud applies in this case; Mantria Financial was a financial institution that was affected by the Mantria Ponzi scheme and other financial institutions also were affected by the scheme; numerous overt acts in furtherance of the securities fraud conspiracy were presented; the evidence established that McKelvy participated in the conspiracy to commit wire fraud and securities fraud; and McKelvy had the requisite criminal intent.  (Doc. No. 274.)

In his Motion for a New Trial, McKelvy asserts similar arguments and others: (1) the Government failed to offer any direct evidence of his criminal intent; (2) the Government failed to

---

[13]  On July 8, 2019, Defendant filed a supplemental letter in support of the Motions.  (Doc. No. 289.)  On July 11, 2019, Defendant filed a second supplemental letter in support of the Motions.  (Doc. No. 290.)  The Court has considered these letters for purposes of this Opinion.

prove he had a legal duty to disclose his commissions or register as a broker and the Mantria investments were not securities; and (3) the Court gave an erroneous good faith instruction. McKelvy also incorporates his arguments from his Rule 29 Motion for Judgment of Acquittal. (Doc. No. 263.)   The Government, in response, claims it presented compelling evidence of McKelvy's criminal intent; proved all elements of securities fraud; the Court's good faith instruction was correct; and McKelvy's Rule 29 arguments asserted under Rule 33 still fail.  (Doc. No. 275.)

McKelvy's Motion for Judgment of Acquittal and Motion for a New Trial are now ripe for disposition.  For reasons discussed below, the Motions (Doc. Nos. 228, 229) will be denied.

## III. STANDARD OF REVIEW

### A.  Rule 29 Motion for Judgment of Acquittal

Under Rule 29 of the Federal Rules of Criminal Procedure, a defendant may file a motion for judgment of acquittal based on insufficient evidence presented at trial.  See Fed. R. Crim. P. 29(c).  On a motion for judgment of acquittal under Rule 29, the court must decide whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" based on the evidence presented at trial.  United States v. Caraballo-Rodriguez, 726 F.3d 418, 431 (3d Cir. 2013) (en banc) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)) (emphasis omitted); see also United States v. Freeman, 763 F.3d 322, 343 (3d Cir. 2014).  The court must view the evidence in a light most favorable to the prosecution and must deny the motion "if there is substantial evidence . . . to uphold the jury's decision."  Caraballo-Rodriguez, 726 F.3d at 430 (quoting United States v. Gambone, 314 F.3d 163, 170 (3d Cir. 2003)).  This standard is highly deferential and dictates that it is not the court's task to "act as the thirteenth juror," weigh credibility, assign weight to evidence, or "substitute [its] judgment for that of the jury."  Id. (citations omitted).  The decision to overturn a conviction based on insufficient evidence may only

be made "where the prosecution's failure is clear," <u>United States v. Leon</u>, 739 F.2d 885, 890 (3d Cir. 1984) (quoting <u>Burks v. United States</u>, 437 U.S. 1, 17 (1978)), or where the verdict "fall[s] below the threshold of bare rationality," <u>Caraballo-Rodriguez</u>, 726 F.3d at 431.

### B. Rule 33 Motion for a New Trial

Under Federal Rule of Criminal Procedure 33, "the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  Granting or denying a motion for a new trial "lies within the discretion of the district court."  <u>United States v. Cimera</u>, 459 F.3d 452, 458 (3d Cir. 2006).   Unlike in a Rule 29 motion for judgment of acquittal, "when a district court evaluates a Rule 33 motion it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case."  <u>United States v. Johnson</u>, 302 F.3d 139, 150 (3d Cir. 2002) (citing <u>United States v. Lacey</u>, 219 F.3d 779, 783-84 (8th Cir. 2000)).  A court may "order a new trial only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted . . . ." <u>United States v. Silveus</u>, 542 F.3d 993, 1004-05 (3d Cir. 2008) (citing <u>Johnson</u>, F.3d at 150).  Indeed, Rule 33 motions are disfavored and should be "granted sparingly and only in exceptional cases."  <u>Id.</u> (quoting <u>Gov't of V.I. v. Derricks</u>, 810 F.2d 50, 55 (3d Cir. 1987)). Exceptional cases include those in which trial errors "so infected the jury's deliberations that they had a substantial influence on the outcome of the trial."  <u>United States v. Thornton</u>, 1 F.3d 149, 156 (3d Cir. 1993) (citation omitted).

## IV. ANALYSIS

Based upon review of the evidence presented at trial and considering it in the light most favorable to the Government as the verdict winner, McKelvy's Motion for Judgment of Acquittal pursuant to Federal Rule of Criminal Procedure 29(c) (Doc. No. 228) will be denied because the jury's verdict finding him guilty on all Counts was supported by sufficient evidence and the statute

of limitations did not lapse.  Furthermore, McKelvy's Motion for a New Trial Pursuant to Federal Rule of Criminal Procedure 33 (Doc. No. 229) will be denied because the interest of justice does not require that McKelvy be afforded a new trial.

**A.  Defendant's Motion for Judgment of Acquittal Pursuant to Rule 29 Will Be Denied.**

As noted above, McKelvey has made at least five arguments in support of his Motion for Judgment of Acquittal.[14]  Each argument is addressed in turn.

**1.  The Government Presented Sufficient Evidence to Show that the Extended Ten-Year Statue of Limitations for Wire Fraud Applies.**

Ordinarily, the statute of limitations for wire fraud and conspiracy to commit wire fraud is five years.  This limitations period is set forth in 18 U.S.C. § 3282, which provides that "[e]xcept as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, . . . unless the indictment is found . . . within five years next after such offense shall have been committed."  § 3282(a).  The five-year statute of limitations, however, can be extended to ten years if the wire fraud and conspiracy to commit wire fraud "affects a financial institution."  See, e.g., United States v. Pellulo, 964 F.2d 193, 214 (3d Cir. 1992); United States v. Heinz, 790 F.3d 365, 378 (2d Cir. 2015) (per curiam); § 3293(2) ("[n]o person shall be prosecuted, tried, or punished for a violation of, or a conspiracy to violate . . . section 1341 or 1343 [wire fraud], if the offense affects a financial institution . . . unless the indictment is returned . . . within 10 years after the commission of the offense.").

In United States v. Heinz, 790 F.3d 365 (2d Cir. 2015), the Second Circuit, in a per curiam opinion, explained the application of the ten-year statute of limitations as follows:

> 18 U.S.C. § 3293(2) extends to ten years the statute of limitations for wire fraud offenses (including conspiracy to commit wire fraud) "if the offense affects a financial institution."  18 U.S.C. § 3293(2).

---

[14]  Although McKelvy has made five arguments as to why the Motion for Judgment of Acquittal should be granted, they are combined under three headings below.

> "[T]he verb 'to affect' expresses a broad and open-ended range of influences." <u>United States v. SKW Metals & Alloys, Inc.</u>, 195 F.3d 83, 90 (2d Cir. 1999). The plain language of § 3293(2) makes clear that "Congress chose to extend the statute of limitations to a broader class of crimes" than those in which "the financial institution is the object of fraud." <u>United States v. Bouyea</u>, 152 F.3d 192, 195 (2d Cir. 1998) (quotation marks omitted). And so § 3293(2) "broadly applies to any act of wire fraud that affects a financial institution," provided the effect of the fraud is "sufficiently direct." <u>Id.</u> (quotation marks omitted).

<u>Heinz</u>, 790 F.3d at 367.

> **a.   Mantria Financial was a "Financial Institution" That Was Affected By The Mantria Ponzi Scheme.**

McKelvy contends that the five-year statute of limitations in 18 U.S.C. § 3282, rather than the ten-year statute of limitations in 18 U.S.C. § 3293(2), applies to Counts 1 through 8 of the Indictment (conspiracy to commit wire fraud and wire fraud) because the alleged offenses did not affect a financial institution. McKelvy argues that he should be granted acquittals on these Counts because the Indictment was filed after the five-year statute of limitations had lapsed.[15] He claims that Mantria Financial cannot be considered a financial institution because (1) Mantria Financial was a fraudulent operation, (2) Mantria Financial's registration under Tennessee law was premised on false information given to the state licensing agency, and (3) the fraud did not affect Mantria Financial. In response, the Government argues that it presented evidence at trial that Mantria Financial was a "mortgage lending business," and therefore a "financial institution" as defined in

---

[15]   The Government does not dispute that if the five-year statute of limitations applied, the Indictment was filed in violation of the statute of limitations. In Count 1, the last overt act alleged occurred on November 20, 2009. (Doc. No. 1 at 21 ¶ 55.) The Indictment was filed on September 2, 2015. Thus, if the five-year statute of limitations applied, the Indictment would have been filed after the limitations period had lapsed.

In Counts 2 to 8, the Government alleges that the scheme occurred from approximately March 1, 2005 to approximately April 30, 2010. (<u>Id.</u> at 22 ¶ 2.) Therefore, if the five-year statute of limitations applied to those Counts, they would have been filed outside the statute of limitations.

18 U.S.C. § 20 and 27.

The definition of "financial institution" in 18 U.S.C. § 1343 is found in 18 U.S.C. § 20 ("Financial institution defined").  This section provides as follows:

> As used in this title, the term "financial institution" means--
>
> (1) an insured depository institution (as defined in section 3(c)(2) of the Federal Deposit Insurance Act);
> . . .
>
> (10) a mortgage lending business (as defined in section 27 of this title) or any person or entity that makes in whole or in part a federally related mortgage loan as defined in section 3 of the Real Estate Settlement Procedures Act of 1974.

18 U.S.C. § 27 ("Mortgage lending business defined") contains the definition of a mortgage lending business:

> In this title, the term "mortgage lending business" means an organization which finances or refinances any debt secured by an interest in real estate, including private mortgage companies and any subsidiaries of such organizations, and whose activities affect interstate or foreign commerce.

As an initial matter, the Government proved at trial that Mantria Financial functioned as a mortgage lending business.  The Government presented evidence showing that mortgages were placed on properties in Tennessee through Mantria Financial as the lender.  (See Govt. Exs. TD 13, TD 14.)  Government's exhibits TD 13 and TD 14, for example, are "Standard Contract[s] of Sale" that name Mantria Financial LLC as the lender.  See id.

Additionally, testimony at trial established that Mantria Financial operated as a mortgage lending business.  Christopher Flannery, Mantria's attorney, testified that Mantria Financial was formed to assist people in obtaining real estate loans to buy land; that he assisted Mantria Financial in obtaining a license under Tennessee law that would allow Mantria Financial to make loans and get paid on the mortgages; and that he was told Mantria Financial then made loans to people to

buy land.  (Doc. No. 248 at 25-26.)[16]  Furthermore, Carl Scott, a former employee for the Tennessee Department of Financial Institutions, also testified.   Scott testified that Mantria Financial was registered as a financial institution to issue mortgages under the Tennessee Industrial Loan and Thrift Act.  (Doc. No. 218 at 8-9.)[17]  Also, evidence introduced during Scott's testimony shows that Mantria Financial was registered in February 2008, and that the registration was terminated in

---

[16]     Christopher Flannery testified as follows:

Q:     Are you familiar with a subsidiary you called Mantria Financial?
A:     Yes.
Q:     Now, what was that?
A:     Mantria Financial was a Tennessee LLC which was formed to assist people in getting real estate loans to buy the land in the development that I went down to see.
Q:     And were you actually involved in the creation of that subsidiary?
A:     Well, [Defendant Wragg] came to me and said our people are finding it hard to get loans from the bank.  I said, well, let's make our own bank.  Most states there are different levels of lender laws or lender permits that I had learned.  I represented a couple of banks in Pennsylvania, you know, ten years ago, and a lot of states have these special type of lenders.  And in Tennessee there was a type of license you could get for a company that was going to make loans upon sufficient collateral, but would not take deposits, would not do checking, or any other kind of consumer business; their only business as making the loan and then getting paid on the mortgage.
Q:     And so did you assist with obtaining a license under the Tennessee law for Mantria Financial?
A:     Yes, I did.
Q:     And once they had that license, did Mantria Financial then make loans to people to buy the land?
A:     That's what I was told.

[17]     Carl Scott testified as follows:

Q:     Okay.  And at the top there it says Industrial Loan and Thrift, what does that mean?
A:     That is basically the finance license whereby the legislators in 1951 created this Act so people would have access to funds, even though the interest rates may be a little higher.
Q:     So was Mantria Financial created under the Industrial Loan and Thrift Act?
A:     Yes, sir.
Q:     Does that make Mantria Financial a financial institution under the laws of Tennessee?
A:     Yes, sir.

January 2010, after the SEC shut down Mantria.  (See Govt. Ex. CS-2.)  Based on this evidence, the Government proved at trial that Mantria Financial financed mortgages on real estate, and that Mantria Financial falls within the definition of a "mortgage lending business."

McKelvy argues, however, that Mantria Financial cannot be considered a financial institution because it was a fraudulent operation.  A financial institution used for fraudulent purposes, however, is still a financial institution under § 27. See United States v. Serpico, 320 F.3d 691, 694 (7th Cir. 2003) (applying ten-year statute of limitations to financial institution that was a willing participant in fraudulent scheme).  Thus, even if Mantria Financial played a part in the fraudulent scheme, it was still a financial institution.

McKelvy also contends that Mantria Financial was not a financial institution based on its registration under the Tennessee Industrial Loan and Thrift Act.  (Doc. No. 262 at 5-14.)  He asserts that to issue mortgages in Tennessee, a business must apply to the Tennessee Department of Financial Institutions and meet the requirements under Tennessee law to issue mortgages. McKelvy contends that because Mantria Financial submitted false information regarding its net worth and falsely indicated that Defendant Knorr owned 51% of Mantria Financial, the mortgages were "invalid."  Id. at 10.  The Court disagrees.  Even if Mantria Financial submitted false information to enable it to issue mortgages in Tennessee, this would not change its status as a financial institution.  As noted previously, engaging in fraudulent conduct does not take an institution out of the realm of what constitutes a financial institution.  Furthermore, even if Mantria Financial obtained their registration or license under false pretenses, the Government was not required to show in this case that Mantria Financial was registered or licensed under state law – the Government was required to prove that Mantria Financial was a mortgage lending business, which it did.  While registration or licensure with the state may be evidence that the business was

a financial institution, state registration is not a requirement under federal law to qualify as a mortgage lending business.

### b. Other Financial Institutions

The Government also proved that other financial institutions were affected by the Mantria Ponzi scheme because they were exposed to an increased risk of loss.  While the Third Circuit has not addressed whether an increased risk of loss, short of actual loss, is sufficient for the ten-year statute of limitations to apply, several other circuits have held that a financial institution is still "affected" for the purposes of § 3293(2) when it is exposed to a risk of loss and not actual loss. See, e.g., Serpico, 320 F.3d at 694 (determining that a jury instruction was proper for the application of the ten-year statute of limitations where it read that the scheme affected a financial institution if it "exposed the financial institution[s] to a new or increased risk of loss" even if the financial institution suffered no loss); United States v. Mullins, 613 F.3d 1273, 1278-79 (10th Cir. 2010) (finding that broad term "affects" includes a "new or increased risk of loss," which is enough to trigger ten-year statute of limitations).  The purpose of the ten-year statute of limitations is to deter "would-be criminals from including financial institutions in their schemes."  Serpico, 320 F.3d at 694.

Here, the Government introduced sufficient evidence at trial that the Mantria Ponzi scheme affected other financial institutions within the meaning of § 3293(2).  Investors testified at trial that McKelvy coached them to raise investable cash by withdrawing funds on their credit cards, home equity loans and other loans from federally insured financial institutions, and to invest the proceeds in Mantria.  For example, Charles Carty testified that he took out a $25,000 home equity loan from his credit union to invest in Mantria based on McKelvy's advice.  (Doc. No. 244 at 156-57.)  The Government presented Carty's Minnequa Works Home Equity Advance Voucher as an exhibit.  (GX CC-6.)  Phil Wahl testified that he took out cash advances on credit cards from

various banks to invest in Mantria based on McKelvy's advice (Doc. No. 242 at 167-71), and the Government presented photographs of Wahl's four credit cards as an exhibit (GX PW-2).  Because these persons and other investors borrowed funds from financial institutions as victims of the Mantria Ponzi scheme, the risk to these institutions was increased as the victims were now in a position where they might be unable to repay the loans.  Furthermore, the financial institutions were affected because their funds were being used to perpetuate the fraud without their knowledge.  Thus, viewing the evidence in the light most favorable to the Government, it met its burden to establish that the fraud affected other financial institutions.

### 2.  Defendant Withdraws Argument Regarding Overt Act Component of Counts 9 and 10.

Next, McKelvy argues that the Government failed to prove any overt act in furtherance of the securities fraud conspiracy and scheme within the six-year statute of limitations as charged in Counts 9 and 10.  In his Reply Memorandum in support of his Motion, Defendant states that "[o]n reflection, McKelvy concedes that much of the [G]overnment's analysis of the overt act issues, Doc. No. 274 at 9-10, is correct; we withdraw our arguments as to the overt acts component of Counts 9 and 10."  (Doc. No. 280 at 11.)  Thus, the Court need not address this issue further.

### 3.  The Government Has Proved an Overall Conspiracy to Commit Wire Fraud and Securities Fraud, and Schemes to Engage in Wire and Securities Fraud.

At trial, the Government established an overall conspiracy to commit wire and securities fraud, and schemes to engage in such fraud.  McKelvy claims, however, that the Government failed to do so because (1) there was no evidence that the victims' investments in Mantria were securities; (2) there was no evidence that he had criminal intent; and (3) co-defendants Wragg and Knorr lied to him.  (See Doc Nos. 228, 262.)  The Court will address each argument in turn.

#### a.  The Government Proved that the Investments Were Securities.

McKelvy claims that the Government's evidence regarding "securities was insufficient and

the Government did not prove that Mantria investments were 'securities.'" (Doc. No. 262 at 26.) McKelvy argues that (1) Government witnesses Kurt Gottschall, an attorney with the SEC, and Christopher Flannery, Mantria's attorney, gave contradictory testimony on whether private placement memoranda ("PPMs")[18] constituted securities in this case, and (2) the Government's position at trial was that PPMs are securities, when they were not. (Id. at 26-28.) In its response, the Government relies on SEC v. W.J. Howey, 328 U.S. 293 (1946) and Steinhardt Group v. Citicorp., 126 F.3d 144 (3d Cir. 1997) in arguing that the investments in Mantria were securities because they were investment contracts, which are securities under the law. (Doc. No. 274 at 10-11.)

McKelvy advised individuals through his Speed of Wealth club and seminars to invest in Mantria. (See, e.g., Doc. No. 242 at 19-20.) At trial, the defense did not contest that the investments in the Mantria entities were not securities, likely due to the broad definition of what constitutes a "security," and because the parties assumed that the victims' investments as evidenced by notes constituted an investment contract. It was explained at trial that investors would receive the PPMs that summarized the investments. (See Doc. No. 249 at 8.) The PPMs referenced notes that would be given to the investors after they turned over their money. (See Doc. No. 249 at 8.) One investor described how she received PPMs in zip files, completed required signature pages, and returned them to Donna McKelvy, Defendant McKelvy's wife, with a check. (See Doc. No. 242 at 34.)

McKelvy notably does not argue that the investments were not securities. In fact, at trial, defense counsel referred to the notes being sold by a PPM as a security. (See Doc. No. 249 at 8.)

---

[18]   The PPMs were created for various Mantria entities, and these were used in part to lure the victims to invest in them.

Rather, Defendant argues that the contradictory testimony given by Flannery,[19] Mantria's attorney,

and Gottschall,[20] an attorney with the SEC, and Government counsel referring to a PPM as a

security his questioning are sufficient for the Court to find that the Government did not prove that

---

[19]   Flannery testified as follows:

> Q:      What's the security in this case?
> A:      Well, there's several different types of securities in this case.  There were notes,
>         there were interests in future earnings; there were several different –
> Q:      And the private placement memorandum; right?
> A:      That's not a security –
> Q:      So –
> A:      –that's a disclosure document.
> Q:      Okay.  Subscriptions, correct?
> A:      That's not a security.
> Q:      Well, then what is a security?
> A:      The security is the item you're buying.
> Q:      So, in connection with Mantria Financial, the notes –
> A:      Right.
> Q:      – 17 percent notes?
> A:      Right.
> Q:      What was the security in connection with the green energy?
>
>                          * * *
>
> A:      I don't recall.  Is that the one with the 25 percent future –
> Q:      Correct –
> A:      Yeah that was –
> Q:      –25 percent profits interest.
> A:      – the security would be your right to a certain percentage of the profits in the
>         future.
> Q:      Okay. So that's what we're taking about as a security?
> A:      Yes.

(Doc. No. 248 at 154-55.)

[20]   Gottschall testified as follows:

> Q:      Now based upon your investigation were the PPMs that were being produced by
>         Mantria, were those, in fact, securities?
> A:      Yes. The – yes.

(Doc. No. 243 at 193.)

the investments were securities.  (See Doc. No. 262 at 26-28.)  However, the evidence at trial

showed that the investments in Mantria were investment contracts, and as Flannery testified, the

securities in this case were the investments reflected in notes and interest from future earnings.

Regarding Gottschall's testimony that the PPMs were securities, he also testified that a security is

an "interest usually, a partial ownership interest in a company or you're providing that company

with your money in the form of debt."[21]

      To invoke the protection of the federal securities laws, an investor must show that the

instrument in question is a security.  Steinhardt, 126 F.3d at 150.  The term "investment contract"

appears in the definition of "security" under both the Securities Act of 1933[22] and the Securities

---

[21] Gottschall testified as follows:

> Q:    So what's the difference then between buying a security and buying a car, for example?
>
> A:    Sure.  So when you buy a car, as you guys probably understand, you can go down to the dealership.  You can kick the tires.  You can raise the hood.  You can even, if it's a used car, you can probably take it to your mechanic and have them check it out.
>
> But when you're buying a security, you're buying something that's essentially intangible.  You're buying an interest usually, a partial ownership interest in a company or you're providing that company with your money in the form of debt. And the difference between buying that and buying something like a consumer product is you can't – you can't go to – if you're going to buy Apple stock, I'll just use that as an example, you can't go to Apple and say – walk in the door and say, I want to see your financials for last week.  And you can't walk onto the floor of an Apple factory and say, I want to understand how the production of the iphone is going.
>
> So when you buy an investment you're almost entirely reliant on what the company discloses about its operations through SEC filings and press releases and earnings calls, that sort of thing.

(Doc. No. 243 at 174-75.)

[22]  15 U.S.C. § 77b(a)(1) defines the term "security" as follows:

Act of 1934.[23]  Under the securities charges in Counts 9 and 10, the definition of security in the

1934 Act, 15 U.S.C. § 78c(a)(10), is the pertinent definition of security.  The task of defining the

---

> The term "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, <u>investment contract</u>, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

15 U.S.C. § 77b(a)(1) (emphasis added).

[23]  Under 15 U.S.C. § 78c(a)(10), the term "security" is defined as follows:

> The term "security" means any note, stock, treasury stock, security future, security-based swap, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, <u>investment contract</u>, voting-trust certificate, certificate of deposit for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

15 U.S.C. § 78c(1)(10) (emphasis added).

term "investment contract" in these statutes has been left to the judiciary, and in 1946 the United States Supreme Court in <u>Howey</u> "took up the task of defining the parameters of an investment contract." <u>Steinhardt</u>, 126 F.3d at 151.[24] The Third Circuit has recognized that in <u>Howey</u>, the Supreme Court interpreted the term "investment contract" as used in the Securities Act of 1933, 15 U.S.C. § 77b(1), is essentially the equivalent of that contained in the Securities Exchange Act of 1934, 15 U.S.C. § 78c. <u>Id.</u> at 151, n. 11. Therefore, the analysis in <u>Howey</u> is applicable when the statute at issue is 15 U.S.C. § 78c(a)(10), which it is here, because McKelvy was charged under 15 U.S.C. 78j(b) and 78ff.

The Supreme Court in <u>Howey</u> held "an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party . . ." <u>Howey</u>, 328 U.S. at 298-99. "Thus, the three requirements for establishing an investment contract are: (1) an investment of money, (2) in a common enterprise, (3) with profits to come solely from the efforts of others." <u>Steinhardt</u>, 126 F.3d at 151 (internal quotations omitted) (citing <u>Howey</u>, 328 U.S. at 301.) Regarding the second element, the Third Circuit applies a "horizontal commonality approach," which requires a pooling of investors' contributions and distribution of profits and

---

[24] The Third Circuit explained the following regarding the <u>Howey</u> test:

> In enunciating this test, the Supreme Court noted that the statutory purpose of compelling full and fair disclosure was fulfilled. The Court further observed that this definition "embodie[d] a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." The <u>Howey</u> test still predominates in investment contract analysis today.

<u>Id.</u> (citations omitted.)

losses on a pro-rata basis among investors.  Id.

Here, the evidence at trial showed that the Mantria investments met the Howey standard. Regarding the first prong, victims testified at trial that they invested their money in Mantria expecting to be paid a return on their investments.  These victims included Deidra Holl (Doc. No. 241 at 59-143;[25] Doc. No. 242 at 5-55), Phillip Russell Wahl (Doc. No. 242 at 149-204), Charles Carty (Doc. No. 244 at 143-171), George Anderson (Id. at 171-216), Bruce Kalish (Id. at 80-126), and Carla Madrid (Doc. No. 246 at 179-242).[26]  Regarding the second prong, Mantria was a

---

[25]  Deidra Holl testified as follows:

> Q:  Do you recall an opportunity by the name of Mantria?
> A:  Yes.
> Q:  And what was that opportunity as it was first introduced to you?
> A:  It was an investment opportunity through Wayde McKelvy and Speed of Wealth where people who were part of his gold club membership, which I was, could provide – you know, we used our IRA monies to cash out and put money into this thing called Mantria.
>
> ***
>
> Q:  Do you know how much you invested in Mantria overall?
> A:  About 165,000, which was my entire life savings and retirement.
>
> ***
>
> Q:  And you were part of the gold club?
> A:  I was part of the gold club.  He promised good returns over and over and over again, and in each webinar we were told how significant the returns were going to be. This was exciting.  For one of them he said it was an opportunity like Microsoft; that the company would go public in a year.  The shares would be sold at $16 a share and we would all be millionaires.  We were – we were thrilled.  You know, the plants were up and running.  Contracts were being signed.

(Doc. No. 241 at 63-64, 70, 88.)

[26]  Carla Madrid testified as follows:

> Q:  And what did Mr. McKelvy say about Mantria's success in the [biochar energy] business?

common enterprise where the victims' investments were pooled with their understanding that they would receive distributions on the profits based on their investments.  (See, e.g., Doc. No. 242 at 86-90.)

Regarding the third prong, the focus is on whether "the purchaser [is] attracted to the investment by the prospect of a profit on the investment rather than a desire to use or consume the item purchased."   Steinhardt, 126 F.3d at 152.    Additionally, whether the investor has "meaningfully participated in the management of the partnership in which it has invested such that it has more than minimal control over the investor's performance" is also relevant.  Id.   Mantria's investors were passive investors who did not exercise control over the funds they gave to Mantria; they did not intend to consume anything in return for the money they invested; and their expected return was from profits to come solely from the efforts of others.  Thus, the prongs of the Howey test have all been satisfied.

Defendant attempts to overcome this application of the law by arguing in his Reply to the Government's Response that the Government's reliance on "investment contracts" comes for the first time in its Response.  (Doc. No. 280 at 14.)  Defendant states that "[i]f the [G]overnment had believed, before or at the time of trial, that the Mantria investments were "investment contracts,"

---

A:      Well, they were great successes and the investments were originally very – large return investments.   They were short-term investments and they were all collateralized by land in Tennessee.

***

Q:      And how much did you actually invest in Mantria Speed of Wealth?
A:      $290,000.
Q:      So you lost the rest of that money?
A:      Yes, I have.

(Doc. No. 246 at 182, 203.)

then it was incumbent on government counsel to articulate that theory through [witnesses] Gottschall and Flannery.  But, that did not happen."  (Id.)  Such testimony was not required.  The trial testimony of the investors and other witnesses noted above shows how the investments made in Mantria satisfy the Howey test.  The investments in Mantria by the victims are securities under the United States Supreme Court's "investment contract" analysis.

Finally, regarding McKelvy's claim in his Supplemental Motion that the Government did not prove that the Mantria investments were "securities" because the two attorneys, Kurt Gottschall and Christopher Flannery, gave contradictory testimony on the PPMs, this argument is unavailing.  Regardless whether the questioning was mistakenly worded by the Government and regardless of Gottschall's response, potentially conflicting testimony does not mean that the defense's argument has merit.  Courts "may not grant a motion for acquittal based on conflicting testimony, that is, testimony of a questionable quality; it is up to the jury to weigh conflicting testimony, determine credibility, and ultimately draw factual inferences."  United States v. Scarfo, 711 F. Supp. 1315, 1334 (E.D. Pa. 1989), aff'd sub nom. United States v. Pungitore, 910 F.2d 1084 (3d Cir. 1990).  Rather, the Court "must grant a motion for acquittal only when the evidence, viewed in a light most favorable to the prosecution is so scant, so insufficient, that the jury could only speculate as to the defendant's guilt."  Id.  "As long as a rational jury could conclude beyond a reasonable doubt that the government has proved all elements of the offense charged, the motion should be denied."  Id.  Thus, despite the potentially conflicting testimony regarding the PPMs, the Government proved that the investments were securities under the Securities Act of 1934.

### b. The Government Was Not Required to Prove That Defendant Acted as a Broker.

McKelvy claims that there were no allegations in the Indictment and there was no proof offered at trial that he acted as a securities "broker." (Doc. No. 262 at 33-35.)  Whether the

Government proved that McKelvy was acting as a securities broker is irrelevant because he was not charged with selling securities without a license, but with committing securities fraud. As explained in the jury instructions, the Government had to prove that McKelvy knowingly made false statements "in connection with the sale of Mantria securities." (Doc. No. 253 at 154.) And as McKelvy recognized in his Reply memorandum, the Court noted in denying his Motion to Strike the Indictment that

> language [in the Indictment] stating that Defendant was not licensed to sell securities, that he attempt to evade SEC regulations, and that federal securities laws generally require a license to sell securities to the general public is relevant to proving the required intent for each charge in the Indictment. Defendant's lack of a license to sell securities, like loss, is relevant to proving his specific intent to defraud. Moreover, this language is relevant to proving that Defendant "intentionally chose not to register with the SEC or obtain the proper licenses because he was afraid that the SEC would learn of and crack down on his fraudulent conduct."

(Doc. No. 151 at 8-9.) Thus, the Government was not required to prove that Defendant was a broker, but evidence surrounding his lack of license was relevant at trial to show his intent on the charges in the Indictment.

### c. The Government Proved Defendant's Fraudulent Intent to Participate in the Offenses Charged.

McKelvy asserts that he did not have the requisite fraudulent intent because there is no evidence he knew "the true financial status" of Mantria. (Doc. No. 262 at 34-35.) McKelvy's testimony before the SEC, however, offered as exhibits during Kurt Gottshall's testimony, indicates otherwise. On October 22, 2009 and November 19, 2010, McKelvy gave sworn statements to the SEC. In his October 22, 2009 sworn statement, McKelvy admitted that he knew that Mantria was not making money and that the only source of money was from the new investors that McKelvy induced to invest. (GX KG-32 at 26) ("The money had to come from somewhere, and I know this is the only place Troy [Wragg] gets money.") McKelvy also admitted that Mantria

30

was worth "squat at this point" because their business had not come to "fruition," despite his representations to the victims that Mantria was worth $100 million or more.  (GX KG-32 at 10.) When asked what his personal net worth was, which included his ownership in Mantria, McKelvy stated "real assets is in my opinion zero" (Id. at 11)[27].

Further, in his November 19, 2010 sworn statement to the SEC, McKelvy made the additional admissions: (1) he made approximately $6.2 million from Mantria between 2007 and 2009 (Id. at 9); (2) when asked about Mantria profits, he stated, "I know they were not profitable" (Id. at 6.); (3) when asked if Mantria was a Ponzi scheme, he admitted that he knew that Mantria was using new investor funds to pay back old investors, but claimed that it was not a Ponzi scheme.

---

[27]   McKelvy's testimony regarding the financial status of the Mantria entities was as follows:

Q:    So what is the value of your ownership in all of those entities?
A:    Squat at this point.
Q:    You believe they have no value?
A:    Of course they have value but we have – the Mantria Industries has our waste conversion system up and running in Dunlop, Tennessee.  It was opened August 1st of this year.  We are in the test states of the product that comes off of it.  We are in the process of selling systems right now.  So I can sit here and give you a figure of what I think it is worth, but what is anything worth until you, until it comes to fruition.  The land out there in Mantria Place I guess appraised, and I'm guessing, from what I understand, close to $100 million.  So I'm guessing I'm worth $20 million there, but until it sells it is not worth anything.  Mantria Records sponsors one group, and they are just on the up and coming.  Until they start making real revenue, I don't think it is worth anything.  Do you want real assets?
Q:    Yes, let's start with that.
A:    Real assets in my opinion is zero, in my opinion.  What is a mutual fund worth until you cash it out?
Q:    Real assets zero, what about the land?
A:    Yes, it is appraised at roughly $100 million.  I don't know an exact number.

(Id. at 11.)  The appraisals on the Tennessee real estate were grossly inflated and fraudulent.  (See Doc. No. 245 at 145; Doc. No. 249 at 71; Doc. No. 252 at 26.)   Given the evidence presented, the jury found by their verdict that McKelvy knew about the real value of the Tennessee land when he pitched the investment opportunities to the victims and told them that their investments were backed by Mantria's assets, including the Tennessee real estate.

(Id. at 8.)  His credibility at trial was an issue for the jury to decide.  Thus, there is sufficient evidence that he knew the true financial worth of Mantria.

### d.  The Government Proved the Existence of a Conspiracy.

McKelvy argues that he is entitled to an acquittal because the Government did not prove that McKelvy had a "unity of purpose" or an "intent to achieve a common goal or objective" with Defendants Wragg and Knorr because they, inter alia, "repeatedly lied to him about the nature of Mantria's financial status and the prospects of Mantria's business."  (Doc. No. 262 at 19.)  To convict McKelvy of conspiracy, the jury was required to find that (1) two or more persons agreed to commit offenses against the United States; (2) McKelvy was a party to or a member of that conspiracy or agreement; (3) McKelvy and at least one other alleged conspirator shared a unity of purpose and the intent to achieve a common goal or objective to commit an offense against the United States; and (4) at some time during the existence of the agreement or conspiracy, at least one of the members performed an overt act in order to further the objectives of the agreement. United States v. Dressel, 625 Fed. App'x 583, 590 (3d Cir. 2015).  Regarding a defendant's mental state required to be convicted of conspiracy, the Government must show that the alleged conspirators shared a "unity of purpose," the intent to achieve a common goal, and an agreement to work toward the goal.  United States v. Korey, 472 F.3d 89, 93 (3d Cir. 2007).  To prove these elements, the Government may rely on direct or circumstantial evidence.  United States v. John-Baptiste, 747 F.3d 186, 205 (3d Cir. 2014).  The Third Circuit "ha[s] also required proof that the defendant had knowledge of the conspiracy's illegal goal."  Id.

Viewing the evidence in the light most favorable to the Government, it proved a unity of purpose and a common goal at trial.  This "unity of purpose" and common goal was to defraud the victim investors and to reap rewards for themselves from the fraudulent scheme.  McKelvy was aware of the problems with the Tennessee land and still pitched it as backing the investments.

Moreover, Knorr testified that she went on the April 2009 Speed of Wealth internet radio show and gave a presentation stating that Mantria was able to produce about 20% more product than other competitors, that Mantria was currently selling the biochar being produced in the Dunlap facility and orders were going out, and that Mantria intended to convert consumer waste into biochar at the Dunlap facility, all of which were not true. (Doc. No. 246 at 33-34.) McKelvy knew that this information was not accurate. These three were also co-owners of the various Mantria ventures. (See id. at 99 (stating McKelvy became owner in Mantria Industries).) McKelvy and Wragg worked on programs together (see id. at 23-25) and did presentations together (see id. at 187). McKelvy had a mentor relationship with Wragg, and the two would speak on the phone together for hours discussing Mantria. (Doc. No. 245 at 163-64.) And co-defendant Knorr testified that McKelvy presented to the investors what she and co-defendant Wragg told him. (Doc. No. 247 at 17.) Further, McKelvy knew that Mantria was using new investor funds to pay back earlier investors.

In addition, the Government presented evidence that discredits McKelvy's claim that Wragg and Knorr lied to him about the true financial status of Mantria. As discussed previously, in McKelvy's October 22, 2009 sworn statement to the SEC, he admitted that he knew that Mantria was not making money, and that the only source of money was from the new investors that McKelvy induced to invest, and that Mantria was worth "squat." (GX KG-32 at 10, 26.) In addition, the evidence showed that McKelvy received $6.2 million from the scheme and that Wragg and Knorr also profited. Thus, the evidence shows a unity of purpose and a common goal, and the fact that Wragg and Knorr may have lied to McKelvy does not negate this element.[28]

---

[28] Defense counsel argued to the jury that there was no evidence of a unity of purpose and that Defendants Wragg and Knorr lied to McKelvy in his closing argument at trial. (Doc. No. 253

**B.  Defendant's Motion for a New Trial Pursuant to Federal Rule of Criminal Procedure 33 Will Be Denied.**

In his Motion for a New Trial, McKelvy appears to make arguments that fall into four categories: (1) the Government failed to offer any direct evidence of his criminal intent; (2) the Government failed to prove that he had a legal duty to disclose his commissions or register as a broker, and the Mantria investments were not securities; (3) the Court gave an erroneous good faith instruction; and (4) he incorporates his arguments made in his Rule 29 Motion.  Granting or denying a motion for a new trial "lies within the discretion of the district court."  United States v. Cimera, 459 F.3d 452, 458 (3d Cir. 2006).   As noted above, unlike in a Rule 29 motion for judgment of acquittal, "when a district court evaluates a Rule 33 motion it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case."  United States v. Johnson, 302 F.3d 139, 150 (3d Cir. 2002) (citing United States v. Lacey, 219 F.3d 779, 783-84 (8th Cir. 2000)).  A court may "order a new trial only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted . . . ."  United States v. Silveus, 542 F.3d 993, 1004-05 (3d Cir. 2008) (citing Johnson, F.3d at 150).   For the reasons below, a miscarriage of justice has not occurred.  Defendant's arguments will be discussed, in turn.

**1.  The Government Presented Sufficient Evidence of Defendant's Fraudulent Intent.**

McKelvy first argues that he is entitled to a new trial because there is no direct evidence from Defendants Wragg or Knorr that he had the requisite criminal intent for any of the crimes alleged in the Indictment.  McKelvy further asserts that Defendant Wragg did not testify, so "there

---

at 46-54.)  As such, the jury was presented with this argument, but rejected it when it found McKelvy guilty.

was no testimony from the one person who was in the best position to testify as to whether or not McKelvy was a culpable participant in any of the conduct alleged . . ."  (Doc. No. 263 at 33.) However, the fact that Defendant Wragg did not testify at trial and Defendant Knorr provided little evidence in her testimony regarding McKelvy's intent is overcome by the substantial evidence presented by the Government showing McKelvy's fraudulent intent.  For starters, the Government claims that it largely proved McKelvy's intent through the direct evidence of McKelvy's testimony before the SEC.  The Court agrees.

As discussed above, McKelvy offered sworn statements to the SEC October 22, 2009 and November 19, 2010.  In his October 22, 2009 sworn statement, McKelvy made the following admissions: (1) that he knew that Mantria was not making money and that the only source of money was from the new investors that McKelvy induced to invest (GX KG-32 at 26) ("The money had to come from somewhere, and I know this is the only place Troy [Wragg] gets money."); (2) that he was receiving commissions of 12.5%, which he did not disclose to the victims "because [he] figured it would be assumed" (GX KG-32 at 14); (3) that he knew that the Dunlap factory was not yet up and running, admitting he knew the factory was still in the "test stages" (GX KG-32 at 10); (4) that he knew that the Dunlap plant was not selling any biochar at that time and they are "holding off on orders until we go through our tests" (GX KG-32 at 27); (5) that Mantria was worth "squat at this point" because their business had not come to "fruition," despite his representations to the victims that Mantria was worth $100 million or more (GX KG-32 at 10) and when asked what his personal net worth was, which included his ownership in Mantria, McKelvy stated "real assets is in my opinion zero" (Id. at 11); (6) that he lived lavishly and he "live[s] good" and his "testimony is [he] do[es] not save money" and "spend[s] every dime [he] make[s]." (GX KG-32 at 44); (7) that until the land in Tennessee sold, he believed it was worth nothing, despite

telling the victims it was worth $100 million (GX KG-32 at 12); and (8) that he knew Mantria's technology was not patented, despite telling the victims that it was (GS KG-32 at 34, 37).

Further, in his November 19, 2010 sworn statement to the SEC, McKelvy made the following additional admissions: (1) he made approximately $6.2 million from Mantria between 2007 and 2009 (Id. at 9); (2) when asked about Mantria profits, he stated, "I know they were not profitable" (Id. at 6.); (3) when asked if Mantria was a Ponzi scheme, he admitted that he knew that Mantria was using new investor funds to pay back old investors, but claimed that it was not a Ponzi scheme.  (Id. at 8.).

Testimony at trial also indicated that McKelvy had the requisite fraudulent intent.  SEC attorney Kurt Gottschall testified about the 2007 SEC investigation.  (Doc. No. 243 at 184-85.). Victims testified about McKelvy's failure to disclose his 12.5% commissions, the lies he told to induce them to invest in Mantria, and the disclaimers he made them sign that included false information.  (See Doc. No. 241 at 97; Doc. No. 242 at 21-22; Doc. No. 244, 162-64.)  McKelvy informed prospective investors in Mantria that it was a profitable and successful company that earned millions of dollars selling real estate and green energy products, and that Mantria investments posed no risk.  (See, e.g., Doc. No. 241 at 93; Doc. No. 242 at 7-8; Doc. No. 246 at 183.)  The Government also presented evidence through Defendant's Knorr's testimony of the close relationship that McKelvy had with Defendant Wragg.  (Doc. No. 245 at 163-64.)

Thus, the Court is satisfied that the Government presented both direct and circumstantial evidence that McKelvy knowingly and willfully made false statements and material omissions to the victims to induce them to invest in Mantria and had the requisite fraudulent intent.

### 2.   Defendant's Arguments Regarding Securities Fraud Are Without Merit.

McKelvy also makes various arguments regarding the securities fraud charges.  First, he argues that he was under no legal duty to disclose his commissions because he was not a "broker."

However, as discussed above, this conflates the legal duty to register as a broker with the evidentiary value of failing to register. McKelvy did not inform the victims that he was receiving a 12.5% commission on all new investor funds, something that the victims would have wanted to know when deciding whether to invest in Mantria. (See Doc. No. 241 at 97; Doc. No. 242 at 21-22; Doc. No. 244, 162-64.) Furthermore, he lied to the victims when he told them he did not charge a "dime." (GX JL-2A 15:5-22.) Thus, whether McKelvy was or was not a securities broker is not the critical inquiry here. As part of the fraud, he did not tell investors that he was receiving commissions, told them he did not charge a dime, and this led investors to believe that he was not being paid for his work, when he was. This is probative of McKelvy's intent to defraud.

Notably, as also discussed above, the Indictment did not charge McKelvy with selling securities without a license. The fact that he did not seek a license to sell securities was offered as proof that he attempted to evade SEC scrutiny, which is probative of his intent to defraud and his lack of good faith. The Government introduced an e-mail exchange between Defendant Wragg and McKelvy where Wragg informed him that he needed a securities license to sell Mantria securities. In response, McKelvy answered, "While this seems like the most logical route I could get handcuffed by my marketing efforts trying to meet compliance issues. [The SEC] really put the squeeze on what you can and cannot say." (KG-11.) McKelvy also stated that "I can guarantee you [the SEC] will take out the most compelling pieces of my marketing material." (Id.) These statements were offered as evidence that McKelvy intentionally chose not to register with the SEC or to obtain the proper licenses because he was afraid that the SEC would learn of his fraudulent conduct.

Second, McKelvy claims that the Government failed to prove that the Mantria investments

were securities.  This argument has been covered extensively <u>supra</u> and is without merit.

### 3.  The Good Faith Jury Instruction Was Correct.

Finally, McKelvy alleges that the Court improperly instructed the jury on his "good faith"

defense.  Specifically, McKelvy challenges the emphasized language in the instruction, which was

as follows:

> A Defendant does not act in good faith if, even though he or she had
> an honestly held belief or opinion, <u>he or she knowingly made false
> statements, representations, or promises to others</u>.

(Doc. No. 263 at 48.)

McKelvy claims that omitting the words "intentionally" and "willfully" allowed the

government to sidestep the elements of criminal intent.  No error is present when the challenged

instructions accurately state the law on the particular issue under scrutiny.  <u>United States v. Fumo</u>,

No. CRIM.A.06-319, 2009 WL 1688482, at *45 (E.D. Pa. June 17, 2009).  The instructions given

and the language in which they are given are matters left to the sound discretion of the trial court.

<u>Id.</u>  Ultimately, the trial court's jury instruction will not be reversible error if, taken as a whole and

viewed in the light of the evidence, the instruction fairly and adequately submits the issues in the

case to the jury without confusing or misleading the jurors.  <u>Id.</u>

Here, the Court appropriately followed the Third Circuit Jury Instructions in charging the

jury on good faith.  The Court's instruction as given to the jury was as follows:

> The offenses charged in the [I]ndictment require proof that the
> Defendant acted either <u>knowingly</u> or <u>willfully</u> or <u>with intent to
> defraud</u>.
>
> If you find that Wayde McKelvy acted in good faith that would be
> [a] complete defense to these charges because good faith on the part
> of Wayde McKelvy would be inconsistent with his acting with the
> required mental state.
>
> A person acts in good faith when he or she has an honestly held
> belief or opinion in the truth of his statements made even though the

belief or opinion turned out to be incorrect.  Thus, in this case, if Wayde McKelvy made an honest mistake or had an honest misunderstanding about whether the statements he made were truthful, that would be inconsistent with the mental states that the Government is required to prove beyond a reasonable doubt for each offense charged.

A defendant does not act in good faith if, even though he or she had an honestly held belief or opinion, he or she knowingly makes false statements, representation, or promises to others.

Wayde McKelvy does not have the burden of proving good faith. Good faith is a defense because it is inconsistent with the requirements of the offenses charged that Wayde McKelvy acted with the required mental states which are elements of the offenses charged.

As I have told you, it is the Government's burden to prove beyond a reasonable doubt each element of the offense including the mental state element.

In deciding whether the Government proved that Wayde McKelvy acted with the required mental states, or, instead, whether Wayde McKelvy acted in good faith, you should consider all of the evidence presented in the case that may bear on Wayde McKelvy's state of mind.

If you find from the evidence that Wayde McKelvy acted in good faith, as I have defined it, or if you find for any other reason that the Government has not proved beyond a reasonable doubt that Wayde McKelvy acted with the required mental states, you must find Wayde McKelvy not guilty of the offenses charged.

(Doc. No. 253 at 144-46.) (emphasis added.)  Thus, the Court did not sidestep the elements of criminal intent, as Defendant claims.  The text that Defendant takes issue with comes directly from the Third Circuit Jury Instruction, which states the following:

[(Name) did not act in "good faith," however, if, even though (he) (she) honestly held a certain opinion or belief or understanding, (he) (she) also knowingly made false statements, representations, or promises to others.]

Third Circuit Jury Instructions, 5.07 Good Faith Defense.

The instruction as it was given is also supported by Third Circuit precedent.  In <u>United</u>

<u>States v. Quality Formulation Laboratories, Inc.</u>, the appellants who were charged with and found guilty of criminal contempt objected to the instruction that "a defendant does not act in good faith if he also knowingly made false statements, representations, or purposeful omissions." 512 Fed. App'x 237, 240-41 (3d Cir. 2013). The Third Circuit "[found] no error in the Court's instruction that a defendant does not act in good faith if he makes false statements, representations, or purposeful omissions." <u>Id.</u> at 240. Therefore, there was no error in the instruction on good faith.

## V.  CONCLUSION

For the foregoing reasons, the Court will deny Defendant's Motion for Judgment of Acquittal pursuant to Federal Rule of Criminal Procedure 29 (Doc. No. 228) and Defendant's Motion for a New Trial pursuant to Federal Rule of Criminal Procedure 33 (Doc. No. 229). An appropriate Order follows.